900 So.2d 82 (2005)
STATE of Louisiana
v.
Alfred SWAIN.
No. 04-KA-1001.
Court of Appeal of Louisiana, Fifth Circuit.
March 1, 2005.
*84 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Shannon H. Huber, Cameron Mary, James Adair, Assistant District Attorneys, Gretna, LA, for State.
Bruce G. Whittaker, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA, and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On August 29, 2002, the Jefferson Parish Grand Jury issued an indictment charging defendant, Alfred Swain, with second degree murder, LSA-R.S. 14:30.1. Defendant was arraigned on August 30, 2002, and pled not guilty.
Defendant filed several pretrial motions, including motions to suppress the evidence and the confession. The trial court heard and denied both of those motions on August 21, 2003.
Defendant was tried by a twelve-member jury on November 4 and 5, 2003. The jury returned a verdict of guilty as charged. Defendant filed a Motion for New Trial and a Motion for Judgment of Acquittal Not Withstanding the Verdict. The trial court denied both motions on December 1, 2003. Defendant waived statutory delays, and the court sentenced defendant that day to a mandatory term of life imprisonment at hard labor, without *85 benefit of parole, probation, or suspension of sentence.
Defendant filed a timely Motion for Appeal on December 1, 2003. The court granted the motion on the same day.

FACTS
Lutricia Lindsey testified that the murder victim, Toni Joseph Swain, was her daughter. Toni was married to defendant, Alfred Swain. She was thirty-one years old when she died on June 29, 2002. Ms. Lindsey testified that Toni and her other three daughters gave her a surprise birthday party at her (Ms. Lindsey's) home that day. Toni was shot and killed outside the home of Ms. Lindsey's neighbor, Leroy Brown. Ms. Lindsey did not witness the shooting, as she was inside her house when it occurred.
Felicia Walker, Toni's sister, testified that her mother, Ms. Lindsey, lives at 2056 Lincolnshire Drive in Marrero. After her mother's party ended, Ms. Walker sat in a chair in front of the house. Toni was talking to Leroy Brown in front of his house next door. Ms. Walker testified that she heard a "pop, pop" sound. There was a pause, and then another "pop, pop." Ms. Walker saw smoke, and smelled something burning. She grabbed her daughter and lay on the ground. When the popping sound stopped, she turned toward Brown's house and saw defendant calmly walking to his truck, which was parked in the middle of the street. Toni was lying in Brown's driveway. Ms. Walker ran inside her mother's house and told her, "Alfred just shot Toni, call 911."
Leroy Brown testified that, at the time of the murder, he lived at 2052 Lincolnshire Drive. On June 29, 2002, he was standing outside his house talking to Toni, whom he had known from the time she was ten or eleven years old. Twenty to thirty minutes into their conversation, defendant arrived in a burgundy colored Chevrolet truck. Toni said to defendant, "[W]hat do you want? Leave me alone." Defendant got out of the truck and walked toward Toni. Defendant said, "Bitch, didn't I tell you I was going to get you." Defendant "came up with" a gun and fired a shot into Toni's side. Defendant then said, "[N]ow I'm going to kill you." Defendant then stood over her and fired additional shots at her. After defendant shot Toni, he got back into his truck and left the scene. The couple's five year old daughter witnessed the shooting.
Dr. Susan Garcia, an expert in forensic pathology, testified that she performed an autopsy on the victim's body. She testified that the victim sustained three recognizable gunshot wounds to the body, and one graze wound to the neck. One bullet entered the right front part of the body beneath the right breast. The bullet traveled through the body, exiting the right side of the back. That bullet did not injure any vital structures, and was not a lethal wound.
A second bullet entered the victim's right chest injuring a lung. Dr. Garcia recovered the bullet from the left back side of the body. The doctor testified that the injury could have been lethal, depending on how much blood the victim lost, and whether or not medical care was administered.
A third bullet entered the victim's left cheek. A projectile was recovered from that area. The bullet injured, but did not penetrate, the brain. That wound could have been lethal, in that the projectile could have caused a concussion or contusion to the brain. Dr. Garcia identified State's Exhibits 44 and 45 as the projectiles recovered during the autopsy.
Sergeant Ralph Parker of the Jefferson Parish Sheriff's Office testified that at 11:45 p.m. on June 29, 2002, he was standing *86 in front of the Detective Bureau. Defendant arrived in a maroon colored truck. Defendant introduced himself to Parker, and calmly informed the officer he wished to turn himself in for the Lincolnshire murder. Parker testified that he already knew about the murder. Parker handcuffed defendant and advised him of his Miranda[1] rights. He then sent for homicide detectives.
Parker testified that there were two female passengers in the truck. Two other officers who were outside asked the women to get out of the vehicle. The officers saw a gun inside the truck. Parker told them not to seize the weapon at that point.
Lieutenant Gray Thurman,[2] a homicide detective, testified that he and Detective Meunier arrived at 2052 Lincolnshire Drive within an hour of the shooting. Thurman learned the victim had been taken to a hospital. He assigned Detective Donald Meunier as the case officer, and the two detectives processed the crime scene. In the driveway of the residence, they located four shell casings, two bullet fragments, a pair of eyeglasses, and a large blood stain. Afterwards, they went to the Detective Bureau to interview witnesses. Defendant arrived there and surrendered. They testified that he escorted defendant, handcuffed, from the front of the building to an interview room.
Thurman advised defendant of his Miranda rights, using a sheriff's office rights form. Defendant signed the form, indicating he understood his rights, and wished to waive them. Thurman testified that he and Meunier interviewed defendant. The interview was recorded on audiotape, and a transcript of the tape was admitted in evidence.
Defendant told the detectives that he had recently filed for a divorce from Toni. He had learned she was seeing another man. Defendant was aware that the victim had obtained a restraining order that prohibited him from going near her. Defendant felt it had prevented him from seeing his six-year-old daughter, Asia, who was living with Toni.
Defendant admitted to having shot and killed Toni, but said he did not know why he had done it. Defendant said he fired four shots; two into the victim's upper body, one to the neck, and another to the head. Toni was still moving after the first two shots, but she stopped moving when the third shot struck her in the neck. After the shooting, he went to his mother's house. Defendant told the officers that the gun he used to shoot Toni was .9mm handgun, and that it was on the floorboard of his truck. He had removed the clip.
Detective Thurman testified that defendant's manner during the interview was matter-of-fact, deliberate, and articulate, as if he were describing an event in which he had not participated. Defendant expressed remorse for his daughter, who had witnessed the shooting, but he did not express remorse for killing the victim.
Detective Meunier testified that when he and Thurman took defendant into the Detective Bureau, he instructed other officers to secure the truck until it could be moved. When the interview was completed, Meunier applied for and obtained a search warrant for defendant's truck. The warrant was executed on July 1, 2002. Officers seized a Taurus .9mm semi-automatic handgun (State's Exhibit 42) with nine.9mm rounds (State's Exhibit 58) and five.38 caliber rounds (State's Exhibit 59).
*87 Timothy Scanlan of the Sheriff's Office Crime Lab, was accepted by the court as an expert in firearms examination. He testified that he test-fired State's Exhibit 42, the handgun. He determined that four bullet casings recovered from the scene were fired from that weapon. He also found that State's Exhibits 44 and 45, the two bullets recovered from the body, were fired from that gun. Scanlan testified that there were two specimens that were so damaged as to make a comparison impossible.
Defendant's mother, Catherine Sterling, testified for the defense. She stated that defendant went to her house after the shooting. He told her he had had an "incident" with his wife. She testified that defendant contemplated killing himself, but that he eventually decided to turn himself in to police.
Defendant testified on his own behalf. He stated that he and the victim had been married for eight years. There had been problems in their marriage. In August, 2000, he discovered a used condom in a wastebasket in their home. He confronted the victim about it, and learned that she had been having an affair with another man. The couple separated. They reconciled briefly in late 2001, and then separated again. They reconciled again in early 2002. Toni continued to be unfaithful.
Defendant testified that, on the day of the shooting, he worked until 3:00 p.m. at his job in furniture repair at Compass Furniture. On his way home, he stopped at another furniture store and bought two appliances. He arrived at his apartment at around 4:00. He and the victim were separated at that time, and he packed some boxes to prepare for his move to a new residence.
Defendant testified that he thought about his family, and decided to drive to where his wife and children were living. He saw they were not at home, so he went to Ms. Lindsey's house. He saw Toni talking to Leroy Brown. He put the truck in reverse and exited. He walked toward Toni and fired his gun at her. He then got back into his truck. He realized what he was doing, but it didn't seem to him like it was happening.
Defendant went to his mother's house. He told her he had shot Toni. His mother asked whether Toni was dead, and defendant responded, "I believe that she is." Defendant testified that he went into his mother's backyard, and made ready to commit suicide by shooting himself. His mother called him inside, however, and he did not attempt suicide. He then decided to turn himself in to authorities.
Defendant testified that he did not plan to kill Toni. Even when he grabbed his gun and exited his truck, it was not his intention to kill her. He testified that he keeps a gun with him at all times for his own safety.

ASSIGNMENT OF ERROR NUMBER ONE
It was error to deny the motion to suppress.

DISCUSSION
By this assignment, defendant complains that the gun deputies seized from his truck pursuant to a search warrant should have been suppressed because the warrant was issued by a commissioner, and not a judge. Defendant made this argument in the trial court, and it was rejected.
At the motion hearing on August, 21, 2003, Detective Meunier testified that when defendant surrendered to officers at the Detective Bureau, he indicated he had killed his estranged wife, and that the gun he had used was on the floorboard of his truck. Defendant had parked the truck in front of the Detective Bureau. Meunier *88 further testified that a door on the truck was open and the weapon was in plain view. Instead of seizing the gun immediately, Meunier decided to secure the vehicle in an enclosed bay at the Detective Bureau and apply for a search warrant. Meunier testified that the warrant was signed by Commissioner Kiff of the Twenty-Fourth Judicial District Court. The truck was subsequently searched, and the gun seized.
Article V, § 1 of the Louisiana Constitution provides, "The judicial power is vested in a supreme court, courts of appeal, district courts, and other courts authorized by this article." Louisiana Constitution Article V, § 22(A) further provides, in pertinent part: "Except as otherwise provided in this Section, all judges shall be elected." The state's district courts derive their authority from LSA-Const. Art. V, § 16, which grants to those courts original jurisdiction in all civil and criminal matters except as provided by law.
Defendant incorrectly asserts that neither the state constitution nor state law gives a commissioner the authority to issue a search warrant. LSA-R.S. 13:717 provides, in pertinent part:
A. There are hereby created three offices of commissioner for the Twenty-Fourth Judicial District Court.
B. The commissioners shall be selected by a majority of the judges of the Twenty-Fourth Judicial District and may be removed from office by a majority of those judges.
. . . .
D. Subject to the other provisions of this Subsection, the commissioners shall have all of the powers of a judge of a district court. The powers of the commissioners shall not be inconsistent with the constitution and laws of this state, the constitution and laws of the United States, the rules of the Twenty-Fourth Judicial District Court, and the duties assigned to the commissioners by that court.
(1) The powers of the commissioners hearing criminal matters shall include but shall not be limited to the power to:
. . . .
(h) sign and issue search and arrest warrants in accordance with the general provisions of law, including the requirement of showing of probable cause.
In State v. Umezulike, 03-1404 (La.2/25/04), 866 So.2d 794, the Louisiana Supreme Court addressed the constitutionality f LSA-R.S. 13:716(B)(1), which delegates authority to issue search warrants to the commissioner of the Fifteenth Judicial District Court. The court determined that the grant of authority to a commissioner to issue search warrants on probable cause is not unconstitutional, noting that there is no requirement that a warrant must be issued by a judge, and that a probable cause determination is a quasi-judicial function. Despite the fact that defendant finds Umezulike to be a "fundamentally flawed decision," it is currently the controlling authority on this issue. Based on the Supreme Court's holding in that case, the trial court did not err in denying defendant's motion to suppress the evidence.
Even assuming, arguendo, the trial court erred in denying defendant's motion to suppress the evidence, the error was harmless. The question raised by the erroneous admission of evidence is whether the trial court's error in admitting the evidence was harmless beyond a reasonable doubt. State v. Boatner, 03-0485, p. 9 (La.12/3/03), 861 So.2d 149; State v. Jackson, 00-1014, p. 11 (La.App. 5 Cir. 12/13/00), 778 So.2d 23, 31, writ denied, 01-0162 (La.11/21/01), 802 So.2d 629 (quoting *89 State v. Harris, 97-0300, p. 3 (La.4/14/98), 711 So.2d 266, 269). To be harmless, the evidence must not have contributed to the verdict. Id. Factors to be considered include the importance of the evidence to the state's case, the presence or absence of additional corroboration, and the overall strength of the state's case. State v. Wille, 559 So.2d 1321, 1332 (La. 1990); State v. Jackson, supra.
It is of no moment whether or not defendant's gun was seized pursuant to a warrant. The officers could easily have conducted a legal, warrantless search under the "plain view" exception to the warrant requirement. Under the plain view doctrine, if police are lawfully in a position from which they view an object that they suspect is contraband, if the illegal nature of the object is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. Horton v. California, 496 U.S. 128, 136-137, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990); State v. Cooley, 03-418, pp. 14-15 (La.App. 5 Cir. 9/30/03), 857 So.2d 1209, 1218, writ denied, 03-3107 (La.3/12/04), 869 So.2d 818. In this instance, deputies were lawfully outside of defendant's truck, and could see the gun through an open door.
The state did not need the gun to prove its case. Defendant confessed to officers that he killed his wife, and he admitted to the killing during his trial testimony. Moreover, the state produced the testimony of Leroy Brown, an eyewitness to the crime. The admission of the gun at trial made little or no difference to the result.
Based on the foregoing, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
It was error to deny appellant's motion for a mistrial premised upon appellant's mid-trial mental incompetency.

DISCUSSION
Defendant argues that the trial court erred in denying his motion for a mistrial, which was predicated on his mid-trial claim that he was mentally incompetent to proceed.
A criminal defendant has a constitutional right not to be tried while legally incompetent. Medina v. California, 505 U.S. 437, 439, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353, 365-366 (citing Drope v. Missouri, 420 U.S. 162, 173, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 114 (1975)). A state must follow procedures sufficient to protect a defendant's right not to be tried while incompetent, and its failure to do so deprives the defendant of his due process right to a fair trial. Id.; State v. Carmouche, 01-0405 (La.5/14/02), 872 So.2d 1020, 1041.
There is a legal presumption that a defendant is sane and responsible for his actions. LSA-R.S. 15:432; State v. Sullivan, 02-35 (La.App. 5 Cir. 4/30/02), 817 So.2d 335, 337. The defendant has the burden of establishing, by a preponderance of the evidence, his incapacity to stand trial. State v. Howard, 98-64 (La.4/23/99), 751 So.2d 783, 791-792, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999); State v. Sullivan, supra. The trial court's determination as to a defendant's competency carries great weight, and will not be disturbed on appeal absent a clear abuse of discretion. State v. Carmouche, 872 So.2d at 1041.
Under LSA-C.Cr.P. art. 641, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." A defendant's mental incapacity to proceed may be raised by the defense, the district *90 attorney, or the court at any time. LSA-C.Cr.P. art. 642; State v. Clark, 367 So.2d 311, 313 (La.1979); State v. Williams, 02-1016 (La.App. 5 Cir. 2/25/03), 841 So.2d 936, 942, writ denied, 03-2205 (La.8/20/04), 882 So.2d 571.
In State v. Bennett, 345 So.2d 1129, 1138 (La.1977), the Louisiana Supreme Court set forth the considerations necessary to determining whether a defendant is fully aware of the proceedings against him:
The decision as to a defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he is faced. See, Note, 6 Loyola Univ.L.J. at 684; Note, 4 Columb.Hum.Rights L.Rev. at 245; See also, United States v. Masthers, 176 U.S.App.D.C. 242, 539 F.2d 721 (1976). Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
See also, State v. Snyder, 98-1078 (La.4/14/04), 874 So.2d 739, 742-743.
LSA-C.Cr.P. art. 643 provides, in pertinent part, "The court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed." LSA-C.Cr.P. art. 775 provides, in part, "A mistrial may be ordered, and in a jury case the jury dismissed when: . . . (4) The court finds that the defendant does not have the mental capacity to proceed[.]"
In the instant case, defendant did not raise the issue of competency prior to trial, or during the state's case. Defendant was the final witness to testify. He was able to answer all of his attorney's questions on direct examination, and did not seem to have any trouble recalling the events leading up to the shooting. He appears to have become agitated when, during cross-examination, the prosecutor questioned him about whether he had planned the shooting in advance.
Defendant began to offer comments and explanations that were not responsive to the prosecutor's questions. The following exchange ensued:
THE COURT:
Sir, you can explain your answer, you really need to try to confine your answers to the questions. All right, we need to  I think we've kind of gone off on a tangent.

*91 THE WITNESS:
Your Honor, when these jurors were being interviewed, several of these jurors I picked because they said  these people, they said they wanted to hear the truth. You see when you try something to hide, you see, that's why I was happy when he said  the District Attorney said, I'm good at tripping up because you see, you can't trip up the truth.
THE COURT:
Listen to me, we got to play within the rules. The rules are that they ask questions and you answer them, okay. It's not for 
THE WITNESS:
But you see what's happening 
THE COURT:
 listen, please listen to me. It's not for you to ask questions to me or you to ask questions to them. All right, get to ask you questions and you can answer them and you can explain them all you want. Like I've said now for the third time, your attorney will get a chance to come back  if you think Mr. Mary's [the prosecutor] trying to trick you or whatever, your attorney's going to get his chance to clear it all up as soon as he's done, okay.
THE WITNESS:
I'm not  Mr. Mary  I'm asking the Court's indulgence.
THE COURT:
Listen, it's not how 
THE WITNESS:
 what I'm trying to say is that 
THE COURT:
 it's not a question of me indulging you or not. It's the Legislature tells us how we have to operate and I operate that way.
THE WITNESS:
But then you have a person just being talked to and he's not have the freedom of speech or rights to talk to these people, that's what they said when they was  when y'all were asking these ladies and gentlemen  these ladies and gentlemen said they wanted to hear 
MR. BOSHEA [defense counsel]:
Mr. Swain, enough, enough.
THE WITNESS:
Well, this is not fair.
THE COURT:
Listen, you can explain your question  your answers all you want. I would ask that you try to tailor your explanation to the question and not going off on a tangent. All right, come on, Mr. Mary, let's move on.
The prosecutor continued with the cross-examination, and at times defendant gave long, unresponsive answers. Finally, the judge intervened again:
THE COURT:
Sir, wait, wait, wait, if you're not going to answer his questions, I'm not going let you sit up here and ramble.
THE WITNESS:
May I be excused, please?
THE COURT:
No, you  are you finished, Mr. Mary?
MR. MARY:
I 
THE COURT:
Your attorney may have some 
THE WITNESS:
I don't want to answer nothing. I really don't.
THE COURT:
Well, why don't y'all confer for a second, all right, before we do this.
MR. BOSHEA:
I don't have any further questions.
*92 When defendant's testimony was completed, there was a discussion out of the jury's presence:
MR. BOSHEA:
After twenty-three years of doing this, I've never seen anything like that in my entire life. Absolutely, positively never. The question I've got to determine is whether or not  and Mr. Mary is going to bring it up to the Circuit Court is whether or not I failed by not asking for a lunacy on this guy. I mean, I did not have any reason to believe, as an officer of this court, that he was in anyway  that he was going to melt anywhere like he did. I did not have any idea, Cameron.
MR. MARY:
Well, I don't think it's a dilemma. I just think he's pissed off with me.
THE COURT:
Well, I don't agree, I don't think  you know, I don't think there's a problem. I think it's clear, he's not insane.
MR. BOSHEA:
Well, I understand that, Judge, I don't think he is either but you understand the concern I have is that somebody's going to read this record and somebody, somewhere, is going to sit back and say: Oh, Boshea should have asked for a lunacy on him.
Now, I don't think he is either, Judge. I'm going to honest with you, if I thought he was, as an officer of the court, I would have brought that forward.
THE COURT:
Sane as you and me.
MR. BOSHEA:
That's what I figure. That's what I figure too, Judge. And I'll be honest with you 
MR. MARY:
I don't think there's grounds for it, Judge.
THE COURT:
What?
MR. MARY:
I don't think there's grounds for it.
THE COURT:
Okay.
MR. MARY:
The defendant is decompensating  I mean freaking out  under cross[-]examination, I don't think that's grounds for lunacy.
MR. BOSHEA:
I don't think so either, Cameron, but do you understand what my concern is? I mean, I've got a concern 
THE COURT:
That's nothing we can deal with now though. I mean that's 
MR. BOSHEA:
But I don't think he's crazy. How can I make a motion that I don't personally believe in?
THE COURT:
Well, you want to do it to preserve the record now, I don't know what to tell you to do.
In open court, defense counsel apologized to the court for defendant's emotional reaction to the prosecutor's questions. Counsel stated:
because of the emotions and the emotional reaction that was shown, there appears to be some question, at this point, of some level of mental incapacity and I don't know what it is and I'm not a doctor. As a result of that, and I realize it's going to be denied, it is incumbent upon me, pursuant to Article 841 and based on the reactions of the defendant on the stand to this Court, to the Prosecutor, to the jury, that I move respectfully *93 for a mistrial in connection with this case.
The court denied counsel's motion without reasons.
Defense counsel offered no evidence of defendant's inability to proceed. Counsel did not allege that defendant had been unable to assist him during the course of the trial, or that defendant did not understand the proceedings. Counsel did not request that the court order a mental examination under LSA-C.Cr.P. art. 643. On the contrary, it is clear from the record that counsel did not believe defendant was incompetent. There is nothing in the trial record to refute the strong presumption of sanity. It is obvious from the record that counsel moved for a mistrial as a matter of trial strategy, and to preserve the issue for appeal.
Based on defendant's own statements to the court, it is apparent that he assisted his attorney in choosing the jury. There is nothing in the record to show that he did not sufficiently assist his attorney throughout the trial. Defendant's trial testimony shows that he was able to recall the events leading up to the shooting, and to recount them in great detail. It appears that defendant became emotionally upset and frustrated during cross-examination. The prosecutor simply asked questions he did not wish to answer. The trial judge, who was in a position to observe defendant's demeanor on the stand, did not feel that his behavior indicated he was incompetent to proceed. There is no basis for a finding that the judge abused his discretion in denying defendant's mistrial motion. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE
It was error to deny appellant's challenge for cause of Juror Robert Gauslin.

DISCUSSION
Defendant complains that the trial court erred in denying his challenge for cause as to a prospective alternate juror who said he was adversely affected by his previous contact with crime. Defendant moves this Court to vacate his conviction.
LSA-C.Cr.P. art. 797 provides that a defendant may challenge a prospective juror for cause if:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence [.]
. . . .
(4) The juror will not accept the law as given to him by the court.
Prejudice is presumed when a trial court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges. State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044, 1078; State v. Kang, 02-2812 (La.10/21/03), 859 So.2d 649, 651. An erroneous ruling depriving the accused of a peremptory challenge is a substantial violation of his rights and constitutes reversible error. State v. Anthony, 98-0406 (La.4/11/00), 776 So.2d 376, 391, cert. denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000); State v. Stein, 04-23 (La.App. 5 Cir. 4/27/04), 874 So.2d 279, 289, writ denied, 04-1345 (La.11/8/04), 885 So.2d 1122. Therefore, to prove there has been an error warranting the reversal of a conviction and sentence, a defendant need only show: (1) the trial court's erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges. Kang, 859 So.2d at 652.
*94 After a twelve-person jury had been selected, the trial court granted the state and the defense two peremptory challenges each in the selection of two alternate jurors.[3] The record shows that defendant exhausted both of those challenges.
Robert Gauslin, a prospective alternate juror, stated during voir dire that he had been the victim of an attempted armed robbery. That experience, along with his exposure to crime during a stay in New York City, had led him to believe "people are capable of crime." When the judge asked him whether he would be able to give defendant the presumption of innocence, Gauslin replied, "I'll try like hell." The judge then asked Gauslin whether he would find defendant guilty just because he did not believe in people. Gauslin said, "Well, you know I'll try to do the best I can."
The judge asked Gauslin if he could give defendant a fair trial, and Gauslin replied, "I don't know. You're talking about a persons [sic] life." The juror then said, "I don't know. I mean I don't know. I just know what happens and that's all I can tell you." When the judge asked him if he would give defendant a fair trial, Gauslin said, "Well, I can try." He then said, "Well, I'll try  yeah, I don't see why I can't." The prosecutor later asked Gauslin how he would vote if the state did not put on any evidence. Gauslin replied that he would vote "not guilty."
Defense counsel moved the court to strike Gauslin for cause. The judge denied the motion. Defense counsel objected to the court's ruling, thereby preserving the issue for appeal. The state used a peremptory challenge to strike Gauslin.
Defendant does not show that he was forced to accept an objectionable juror due to the trial court's denial of his challenge for cause. Gauslin was ultimately stricken by the state. In any case, the record shows that the alternate jurors were dismissed at the start of deliberations. They, therefore, had no effect on the verdict in this case. Absent a showing of actual prejudice, defendant's claim fails. See State v. Jones, 03-3542 (La.10/19/04), 884 So.2d 582, 591-592; State v. Hotard, 03-435 (La.App. 5 Cir. 12/30/03), 864 So.2d 748, 753-754. This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER FOUR (Errors Patent)
Assigned as error are all errors patent.

ERRORS PATENT DISCUSSION
The record was reviewed for errors patent. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). The review reveals no errors in this case.

DECREE
Accordingly, for the reasons assigned herein, the conviction and sentence of defendant Alfred Swain, are affirmed.
AFFIRMED.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The lieutenant's name is alternately spelled "Thurmon" and "Thurman" in the record.
[3] LSA-C.Cr.P. art. 789(A) provides, in pertinent part:

If the court determines that alternate jurors are desirable in the case, the court shall determine the number to be chosen. The regular peremptory challenges allowed by law shall not be used against the alternate jurors. The court shall determine how many additional peremptory challenges shall be allowed, and each defendant shall have an equal number of such challenges.