FREDERICKA HOMBERG WICKER, Judge.
^Defendant appeals his conviction for second degree murder claiming that the evidence presented against him at trial was not sufficient to support his conviction. Defendant further assigns as error the trial court’s denial of his motion to suppress text messages obtained by police through a subpoena duces tecum without a showing of probable cause. For the reasons discussed herein, we affirm defendant’s conviction.

Procedural Background

On November 19, 2009, a Jefferson Parish Grand Jury returned an indictment charging defendant, Eric J. Bone, with the second degree murder of Demetrius Jackson in violation of La. R.S. 14:3o.!.[1] Defendant was arraigned and pled not guilty. On May 10, 2011, defendant proceeded to trial before a twelve-person jury. On May 13, 2011, the jury found defendant guilty as charged. On May 19, 2011, the trial judge sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. On May 24, 2011, defendant filed a motion for appeal, which was granted by the trial court.

*53
\xFactual Background

The victim, Demetrius Jackson, was shot and killed outside of Cesar’s nightclub in the early morning hours of July 25, 2009. Kyron Jackson, the victim’s brother and a member of the Calliope Gang, arrived at Cesar’s nightclub with a group of friends between 12:30 and 1:00 a.m. on July 25, 2009. Members of the Gert Town gang, including defendant (aka “Heavy”) and co-defendant Shawn Flot, subsequently arrived at the club and confronted the Calliope gang. Kyron testified that members of the Calliope gang began “fussing” and “throwing money up” at the Gert Town gang members; he further stated that one member of the Calliope gang spit in Shawn’s face leading to a “big old confrontation.” Kyron testified that the actions of the Calliope gang prompted Shawn to tell Kyron, “I’m going to kill you when we get out the club.” At some point during this verbal confrontation, an unrelated physical altercation took place among some other patrons of the club and the Gert Town and Calliope members left the club. Kyron testified that while he, the victim, and another Calliope gang member known as “Stink” began walking to their car, a vehicle driven by defendant and occupied by other Gert Town members pulled up on the roadway and stopped. Kyron testified that co-defendant Shawn Flot exited the vehicle and began shooting; Kyron ran back toward the club but noticed that defendant’s car circled the block to apparently see if anyone was shot before fleeing the scene. Kyron followed the ambulance to the hospital to see his brother but did not provide any information to investigating authorities that night.
Officer Jacob Tapley testified that he was working a detail at Cesar’s nightclub on July 25, 2009, when the shooting occurred. Officer Tapley was outside of the club, approximately 300 feet away, when he heard gunshots. Tapley testified that he did not witness the shooting but did notice a silver four-door |4vehicle driving away from the scene at a high rate of speed; he radioed the description of the vehicle into headquarters and ran to the victim to render assistance. On cross-examination, Tapley testified that he never saw anyone getting out of the vehicle and never saw any doors open or close; further, he testified that he never observed the vehicle circle the block or return near the scene.
Officer Alton Savage testified that he was working a detail a few blocks away from the shooting on July 25, 2009. Savage testified that he received the description of an Infiniti vehicle involved in a shooting over his radio and, within seconds, noticed a vehicle matching the given description traveling at a high rate of speed. Savage activated his emergency lights and attempted to stop the Infiniti; he further noted the vehicle’s license plate number and testified that the vehicle appeared to contain four occupants. Savage testified that the vehicle’s driver refused to stop and a high speed chase continued to the interstate where Savage lost sight of the vehicle near the I — 10 Slidell exit. A vehicle that matched the license plate and description given after the shooting was recovered burned and abandoned that same day in New Orleans.
Detective Ashton Gibbs testified that he reported to the shooting scene at approximately 3:00 a.m. to investigate the homicide but that the bar patrons were either uncooperative or stated that they did not witness the shooting. The only lead provided to Detective Gibbs was the vehicle’s license plate number, which he learned was registered to an Erica Bone. Detective Gibbs and another officer went to Erica Bone’s home. She told the officers that her mother and defendant, her broth *54 er, were the primary drivers of the vehicle. Erica Bone provided her mother’s address where defendant also lived. Detective Gibbs subsequently went to defendant’s mother’s home. Sandra Bone told Detective Gibbs that she did not know where her son was.
| ^Detective Gibbs testified that Sandra Bone later contacted him and told him that she wanted defendant to meet with him. Detective Gibbs brought defendant to headquarters where he provided a statement disclosing that he was at Cesar’s nightclub on July 25, 2009, but declined to provide any further details without an attorney.
Approximately one week after the shooting, Detective Gibbs met with Kyron Jackson who identified defendant in a photographic lineup as the driver of the vehicle involved in the shooting. Detective Gibbs testified that Kyron went back and forth as to the identity of the shooter but ultimately identified co-defendant Shawn Flot as the shooter. Based upon the information developed during the investigation, officers arrested defendant and co-defendant Shawn Flot and executed search warrants of their homes. From defendant’s bedroom, detectives seized photographs depicting defendant, Shawn Flot, and a Darrin Jones together, as well as a T-shirt depicting members of the “Gert Town” gang; they also recovered an Infiniti ignition key, documentation relating to the vehicle, a Samsung cell phone with a contact number for “Shawn,” a holster, and two magazines. Detectives additionally seized hand-written lyrics to a rap song containing the phrase, “I stumped my ass off, black Glock, with my 40,” which Detective Gibbs testified made reference to the Gert Town gang and the idea of killing as a hobby. From Shawn Flot’s residence, Detective Gibbs recovered a .40 caliber Glock handgun and a 9 mm handgun. Detectives also recovered a second handgun from a vehicle belonging to Shawn Flot’s father. The weapons seized were tested and none of the weapons were consistent with the shell casings found at the scene.
Detective Gibbs also testified that Erica Bone provided him with defendant’s cell phone number; Detective Gibbs gave that cell phone number to his supervisor 1 fito obtain a subpoena for defendant’s cell phone records. After the detectives received records from Sprint Nextel, they learned that the phone number was registered to defendant’s mother, Ms. Sandra Bone, and that many text messages received through the subpoena made reference to the shooting at Cesar’s on July 25, 2009. Detective Gibbs testified that the text messages made reference to the victim known as “Little D” and also referred to the vehicle being “long gone.” Through defendant’s cell phone records, Detective Gibbs identified individuals who communicated with defendant following the murder as Sandra Bone, Erica Bone, Shykeva Bone, Wilkena McCalebb, and Jasmine Dixon, who all testified at trial.[2]
Joseph Trawicki, a records custodian for Sprint Nextel, testified that the company received a subpoena for records relating to phone number 504-415-9231. Sprint Nex-tel responded to the subpoena and provided documentation reflecting the subscriber information, a call detail record log, and a printout of text messages sent and received for the date requested, July 25, 2009. The records demonstrate that the subscriber or owner of the phone is defen *55 dant’s mother, Sandra Bone; the call detail log reflects the incoming and outgoing calls of that number in the hours following the murder. Trawieki testified that Sprint Nextel’s subpoena compliance department produced records of subscriber information and call detail record logs relating to additional phone numbers subscribed to various individuals including Shykeva Bone, Lucelia McCalebb, Erica Bone, Sandra Bone, and Jasmine Dixon; subsequently, Sprint Nextel’s compliance department also produced printouts of text messages sent and received on those numbers.[3]
[ 7Pefendant’s friend, Wilkena McCalebb, testified that she was with defendant on the night of the shooting and that defendant dropped her off in his Infiniti at approximately 1:00 a.m. She further testified that her friend, Tia, who was also with them that night, used her phone to exchange text messages with defendant after the shooting. Specifically, the text messages state, “[a]lright, luv, but don’t kick dat to nobody what I told you, not even Darrin,” to which Tia responded, “What?,” and defendant stated, “Da shit at Ceaser.”
The defendant’s cousin, Shykeva Bone, also testified and confirmed that defendant is part of the “Gert Town Hounds” and that defendant was at Cesar’s on the night of the shooting. Shykeva called defendant after the shooting because a friend from high school at the club, whose name she could not recall, told her someone had shot at defendant. She confirmed that she spoke with defendant at approximately 4:43 a.m. and that he told her they “had a shoot out ... and to watch the news to see if his car was on it.” Shykeva further admitted that she texted a friend after the shooting, “Dat was Heavy and dem shooting,” to which her friend replied “who said that?,” to which Shykeva responded, “Heavy just called me ...” Shykeva also testified that, after speaking with defendant, she texted Erica Bone and instructed her that “he [the defendant] said if they come back to you say you don’t know where the car is. My auntie didn’t know he had the car.”
Erica Bone, defendant’s sister, testified that the Infiniti is registered in her name but that her mother, Sandra Bone, and defendant are the primary vehicle drivers. Erica testified that she first learned of the murder at approximately 3:00 a.m. when the police arrived at her home looking for the Infiniti and threatened her to provide information about her brother’s whereabouts. She testified that she did not speak to defendant following the shooting, but admitted that the phone records reflect she spoke to defendant at 4:47 a.m. for a duration of 441 seconds. She | ^further testified that she did not recall speaking with or texting Shykeva about the Infiniti but then admitted that text messages from Shykeva’s phone reflect that she did exchange text messages with Shykeva concerning the whereabouts of the Infiniti following the shooting.
Sandra Bone, defendant’s mother, also testified at trial. Ms. Bone testified that she drove the Infiniti to work at 6:00 a.m. and returned home after 8:00 p.m. on July 24, 2009. She stated she did not know whether defendant drove the Infiniti that night after she got home. Ms. Bone first learned of the murder between 3:30 a.m. and 4:00 a.m. from her daughter, Erica Bone. Ms. Bone stated that she attempted to call her son “200 times” following the *56 shooting but did not speak with defendant until two days later. During her conversation with defendant, he told her, “Momma, don’t worry about it, I just need a lawyer, cause they’re saying certain things about me and I’m on the news.” Ms. Bone further confirmed that defendant had been shot at on two separate occasions in April and June of 2009, but that the Infiniti was never struck by any bullets.
Nina Jackson, the victim’s mother, also testified. She stated that she and her sons relocated to Kentucky following Hurricane Katrina and had just moved back to New Orleans two weeks before her son’s murder. Ms. Jackson testified that her son Kyron called her immediately after the shooting and told her that “the man had just shot D.” Ms. Jackson testified that Sadiki, her son’s cousin, called her on the other line crying that they had just shot “D.”[4] Ms. Jackson further confirmed that, approximately two weeks after Kyron spoke with detectives concerning the murder, he was “gunned down by the Daquiri Shop” and was in the hospital for a week.
|flDr. Fraser Mackenzie, forensic pathologist, performed the autopsy on the victim and testified that the victim sustained several gunshot wounds, two of which were fatal and located in the victim’s right back. On cross-examination, Dr. Mackenzie testified that the victim also sustained a gunshot wound to the temple area, which contained a “burn-like” or “stippling” area around it which could indicate that the gun was fired in close proximity to the victim. However, on re-direct examination, Dr. Mackenzie testified that due to the depth of the bullet’s penetration, it is more likely that the “stippling” effect was caused by the bullet’s ricochet off of another object and not from a gun fired close to the victim’s head. Dr. Mackenzie further opined that the lack of burned or unburned gun powder in the stipple abrasion indicates that the shooter had to be greater than two feet away from the victim.
Officer Amy Sperando, the responding crime scene technician, testified that she collected eight .40 caliber casings within approximately two feet of the pool of blood around the victim and a number of projectiles from vehicles parked near the scene. Sperando also reported to the scene of the burned vehicle in New Orleans and testified that she found nothing of evidentiary value inside the vehicle. Jene Rauch qualified as an expert in the field of forensic firearms examination and testified that she examined the cartridge casings, projectiles, and three firearms recovered in connection with the shooting. Rauch testified that her examination revealed that all eight .40 caliber cartridge casings recovered from the scene were fired from the same weapon. However, she stated that she was unable to determine whether the projectiles, which officers recovered in fragments from the victim’s body and from the scene, were fired from the same weapon.[5] Rauch testified that | inthe markings on the cartridge casings were consistent with pistols manufactured by Glock but opined that the cartridge casings recovered from the scene were not fired from any of the firearms seized pursuant to the search warrants in this case.
Upon conclusion of the state’s case, the defendant, Eric Bone, testified. Defendant recalled the events surrounding the evening of the shooting and testified that *57 he was at Cesar’s nightclub on July 25, 2009. He stated that the Gert Town gang and the Calliope gang began “fussing” at each other when three members of the Calliope Gang, including Kyron, reached for their waistbands and flashed guns at defendant. He further testified that he and Shawn decided to leave the club to avoid any further confrontation when someone spit on Shawn’s face.[6] Defendant testified that his car was parked across the street from the club. He stated that as he drove away he noticed three individuals, two of whom he knew from the Calliope gang, walking on the street. He testified that Kyron first noticed defendant’s vehicle and began shooting at it. Defendant testified that no one exited the vehicle at any time; he did state that, as he drove away, he heard gunshots coming from the back seat of his car. Defendant testified that Shawn was sitting in the front passenger seat and that one of Shawn’s friends, named Brandon, was sitting in the back seat. When asked why he did not stop after the shooting or when being followed by police, he testified that Brandon was in the back seat, pointing a gun to his head, instructing him to continue driving and saying “you better not stop.” Upon returning to his neighborhood after the police chase, Brandon asked defendant to drive to his girlfriend’s house. Defendant testified that he gave Brandon the Infini-ti’s keys and walked to his neighbor’s house to get a ride to a hotel. Defendant explained his theory that Kyron Jackson, the victim’s brother, Infired the fatal shot. Defendant explained that Kyron was standing behind the victim and “there’s no way that the person in my car could have shot him in the back.[7]”

Discussion

We will first consider defendant’s claim that the evidence at trial was not sufficient to support his conviction. When the issues on appeal pertain to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.[8] State v. Hearold, 603 So.2d 731, 734 (La.1992).
In this assignment of error, defendant claims that the physical evidence, including the location of the victim’s gunshot *58 wounds, proves that Kyron Jackson was standing behind the victim and is in fact responsible for the fatal gunshot wound to the victim. Defendant argues that the witnesses’ testimony is conflicting; further, that Officer Tapley, the nearest unbiased witness, testified that no one exited defendant’s vehicle. Defendant argues that Officer Tapley’s testimony supports his version of events that evening. The state contends the evidence demonstrated a long-term feud between the Gert Town and Calliope gangs and that Kyron Jackson’s testimony supports a finding that co-defendant Shawn Flot shot the victim and that defendant was a principal to that shooting and facilitated the murder by driving the get-away car.
1 t2The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. King, 06-554 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied, 07-0371 (La.5/4/07), 956 So.2d 600.
An appellate court’s primary function is not to redetermine the defendant’s guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, our function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the jury’s conclusion. State v. Banford, 94-883 (La.App. 5 Cir. 3/15/95), 653 So.2d 671.
Evidence may be direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59, p. 5 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Wooten, 99-181, p. 4 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208.
Defendant’s charge — second degree murder — is defined as the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. Specific intent is defined as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. |1S14:10(1). Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact and a review of the correctness of that determination is guided by the Jackson standard. State v. Gant, 06-232, p. 8 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1111, writ denied, 06-2529 (La.5/4/07), 956 So.2d 599 and State v. Spears, 05-0964 (La.4/4/06), 929 So.2d 1219, 1224. Specific intent may be inferred from the circumstances and defendant’s actions as well as the extent and severity of the victim’s injuries. The act of aiming a lethal weapon and discharging it in the victim’s direction supports a trier of fact’s finding that the defendant acted with specific intent to kill. Additionally, flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. Id.
A person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime are equally culpable. See La. R.S. 14:24 and State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, 880. Princi *59 pals are defined as “all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime.” La. R.S. 14:24. Only those who knowingly participate in the planning or execution of a crime are principals to that crime; mere presence at the scene does not make one a principal to that crime. State v. Pierre, 93-0893, p. 4 (La.2/3/94), 631 So.2d 427, 428 (per curiam).
In the present case, it is undisputed that the victim, Demetrius Jackson, was shot to death outside of Cesar’s nightclub on July 25, 2009. It is also undisputed that defendant was driving the vehicle from which a passenger fired shots in the direction of the victim. Defendant claims that the evidence proves that the victim’s 114own brother, Kyron Jackson, shot and killed him during a “shoot-out”; further, that defendant was unaware that his back seat passenger, Brandon, would shoot at the victim and his friends. Defendant further argues that he sped away because the shooter in his vehicle, Brandon, pointed a gun at him and instructed him to flee.
The state, however, presented the testimony of Detective Gibbs and firearms examiner, Jene Rauch, that only one weapon was used in the murder and that the scene did not support the proposition that a “shoot-out” occurred. Further, although defendant asserts that Kyron and other members of the Calliope gang flashed weapons at him inside of the club, the state also presented video surveillance depicting Kyron and others going through a metal detector and being patted down for weapons by security guards before entering the club with no weapons being discovered.
The state also presented evidence proving a territorial conflict between the Gert Town and Calliope gangs to prove that the killing of Demetrius Jackson was gang-related. Kyron testified that when the members of the two gangs met inside Cesar’s nightclub there was a “confrontation” and Shawn told him, “I’m going to kill you when we get out the club.” He further testified that defendant drove up in his Infiniti with other Gert Town gang members at which time Shawn exited the vehicle and began shooting in their direction. Kyron further testified that defendant’s vehicle did not move for ten to fifteen seconds after Shawn began shooting and that defendant drove off and then circled the block to see if anyone had been shot. Kyron identified defendant as the Infiniti’s driver and Shawn as the shooter. Kyron admitted that he initially identified defendant as the vehicle driver and he first identified an individual named Darrin as the shooter because he wanted “street justice” and did not want to be labeled a rat. However, within a few weeks of his brother’s murder, Kyron was shot multiple times; after that incident, Kyron _[^testified that his family convinced him to tell the truth about his brother’s murder and to testify at trial. Kyron subsequently identified Shawn as the shooter and maintained that defendant was the driver of the vehicle involved.
Defendant’s cousin, Shykeva Bone, confirmed that defendant is part of the “Gert Town Hounds” and testified that she spoke ■with defendant following the murder; the printout of Shykeva’s text messages reflects Shykeva sent a text message to a friend stating, “[d]at was Heavy and dem shooting” indicating defendant’s involvement in the murder. The text messages exchanged between Shykeva Bone and Erica Bone reflect that defendant instructed Shykeva to have Erica Bone tell police that she did not know the whereabouts of the Infiniti. The text messages exchanged *60 between defendant and Jasmine Dixon also reflect that defendant retreated to a hotel with “dem hounds” following the murder and that defendant knew his vehicle was “long gone.”[9]
Concerning defendant’s claim that the physical evidence in this case establishes that Kyron Jackson shot his brother, the record does not support that assertion. Rather, the evidence demonstrates that all casings retrieved from the scene were fired from a single gun. This contradicts defendant’s claim that a “shoot out” occurred between Kyron and his back seat passenger, Brandon. Further, although Officer Tapley testified that he did not see anyone exit the vehicle before the shooting, he also testified that he was approximately 300 feet away from the scene and was addressing another altercation outside of the club at the time.
| lfiMoreover, it is undisputed that defendant was the driver of the vehicle from which shots were fired in the direction of Demetrius Jackson and that defendant fled the scene, engaging in a high-speed chase with a police officer. The state also established that investigators found defendant’s vehicle burned out later on the day of the murder within a mile of defendant’s residence. Additionally, the items Detective Gibbs recovered from defendant’s home when he executed a search warrant, such as rap lyrics and photographs of the Gert Town gang members, refer to the Gert Town gang and killing as a hobby. Further, the testimony regarding ongoing violent exchanges between the Calliope and Gert Town gangs — including prior shootings — establish defendant’s motive to injure the victim who was affiliated with the rival gang.
In this case, it appears the jury chose to believe Kyron’s recollection of events leading up to the shooting and credited the testimony which implicated defendant in the victim’s death. Further, the jury chose to believe that the shooter intended to inflict death or great bodily harm upon Demetrius Jackson — rather than defendant’s version of the events, that Kyron Jackson accidentally shot his brother. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. Viewing the evidence in a light most favorable to the prosecution, a rational juror could conclude, from the totality of the evidence presented by the state, that defendant was a principal to the second degree murder of Demetrius Jackson. Accordingly, this assigned error is without merit.
Defendant also assigns as error the trial court’s denial of his motion to suppress text messages police obtained during the investigation through a subpoena duces te-cum without a probable cause showing. On July 25, 2009, the | T7Jeffers on Parish District Attorney’s Office filed a motion for the issuance of a subpoena duces tecum pursuant to La.C.Cr. P. art. 66 to Sprint *61 Nextel for account information, call detail records, incoming/outgoing text messages, and GPS of the mobile device for defendant’s phone number. In its motion, the state asserted that it had reasonable grounds to obtain the requested information as possible evidence in the criminal investigation of Demetrius Jackson’s death. On the same day, Judge Henry Sullivan, Jr. issued an order finding that the state demonstrated reasonable grounds to compel Sprint Nextel to produce the requested-records to aid in the criminal investigation. The Sprint Nextel response included account subscriber information, the call detail record log, and a printout of the ingoingbutgoing text mes-' sages for the date of the murder, July 25, 2009. The text messages at issue refer to the shooting outside of Cesar’s nightclub and in the body of the messages the sender (defendant) acknowledges that the police are looking for him in connection with the murder. The records also reveal that Sandra Bone, defendant’s mother, is the account holder for the phone number.[10]
Defendant filed a Motion to Suppress asserting that the text messages were unlawfully obtained because they were obtained prior to indictment and without a showing of probable cause as required under the Electronic Communication Privacy Act. In brief to this Court, defendant claims that his constitutional rights were violated and that he has a reasonable expectation of privacy in the content of any text messages sent or received by a phone on which he is the “exclusive user,” citing U.S. v. Jones, - U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). Defendant also argues that the inevitable discovery doctrine is inapplicable in this case because police misconduct is evidenced by failure to produce a probable cause affidavit in connection with the subpoena for defendant’s cell phone records. The Instate responds that despite any Fourth Amendment privacy argument, the text messages are admissible under the inevitable discovery ■ doctrine. The state also contends that it is unreasonable for defendant to claim an expectation of privacy in the messages because (1) defendant is not the subscriber or owner of the cell phone number at issue; (2) the privacy policies issued by Sprint Nextel specifically warn customers that information may for certain reasons be disclosed to authorities; and (3) defendant admits in the messages he sent from his phone that he did not have a subjective expectation of privacy in the messages.[11] Finally, the state argues that any error in admitting the text messages is harmless because the verdict is supported by the witness testimony of Kyron Jackson and the other evidence presented at trial.
On August 12, 2010[12], the trial court conducted a hearing on defendant’s motion to suppress. At the hearing, Detective Gibbs testified that he learned of defendant’s cell phone number from an interview with his sister, Erica Bone. After a subpoena duces tecum was issued, Detec *62 tive Gibbs received documents from Sprint Nextel concerning defendant’s phone number, including all phone call records and the content of outgoing and received text messages. Detective Gibbs also testified that he subsequently obtained a search warrant for defendant’s residence, from which he recovered the actual cell phone used by defendant. Detective Gibbs testified that a subpoena duces tecum was also issued to obtain phone records for phone numbers of individuals with whom defendant communicated in the hours following the murder.[13] When Sprint Nextel responded to that subsequent subpoena by producing only the account information and phone | iacall detail records but not the content of text messages, a search warrant was prepared to obtain the text messages associated with the phone numbers of those individuals.[14]
The trial court permitted the parties to submit post-hearing briefs on the issues. On September 15, 2010, the trial court denied the motion with written reasons, limiting its ruling to the specific facts of this ease; the trial court found that defendant, under the facts of this case, does not have a reasonable expectation of privacy in the text messages disclosed by Sprint Nex-tel.[15]
For the reasons discussed herein, we find the trial court erred in denying defendant’s motion to suppress and in finding that defendant does not have a reasonable expectation of privacy in his text messages. However, after review of the record, we find the trial court error to be harmless and affirm defendant’s conviction.
In a hearing on a motion to suppress, the state bears the burden of establishing the admissibility of evidence seized without a warrant. State v. Butler, 01-0907, p. 6 (La.App. 5 Cir. 2/13/02), 812 So.2d 120, 124. The trial court’s denial of a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Butler, 01-0907, p. 6 (La.App. 5 Cir. 2/13/02), 812 So.2d 120, 124.
In this case, the state obtained an order issuing a subpoena duces tecum pursuant to La. C. Cr. P. art. 66[16] to Sprint Nextel for defendant’s cell phone 1 anrecords, including text messages. A subpoena duces tecum issued under La. C.Cr.P. art. 66 is not the “functional equivalent” to a search warrant because it does not require a showing of probable cause; article 66 imposes only a reasonable grounds standard. State v. Lee, 05-2098 (La.1/16/08), 976 So.2d 109, 124. In instances when a subpoena duces tecum *63 serves as a de facto search warrant, the application for a subpoena under article 66 must rest upon a showing of probable cause. Id. In this case, the state did not provide a sworn probable cause affidavit in connection with the subpoena duces tecum issued to Sprint Nextel. The issue presented is whether the collection and review of the content of defendant’s text messages associated with his cell phone number constituted a “search” as contemplated by the protections under the Fourth Amendment and thus required a showing of probable cause.
 Although defendant cites the Stored Communication Act (SCA) as part of the Electronic Communications Privacy Act[17] as grounds for protection of his privacy to his electronic communications, the SCA offers no suppression remedy for criminal defendants.[18] Rather, a criminal defendant must seek protection for electronic communications under the Fourth Amendment to the Unites States Constitution and Article 1, § 5 of the Louisiana Constitution, which prohibit unreasonable searches and seizures. A person is constitutionally protected against unreasonable search and seizure of his house, papers and effects. U.S. Const, amend. IV; La. Const, art. I, § 5 (1974) and State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, 1027. Thus, a search and seizure of such shall only be made upon a warrant issued on probable cause, supported by oath or affirmation, and particularly describing the place to be searched and thing(s) to be seized. Id. | ¾1 Warrantless seizures are per se unreasonable unless they can be justified under one of the narrowly drawn exceptions to the Fourth Amendment’s warrant requirement. State v. Freeman, 97-1115, p. 5 (La.App. 5 Cir. 12/29/98), 727 So.2d 630, 634.
However, a defendant only has standing to challenge a subpoena issued without a showing of probable cause as an infringement on his Fourth Amendment right when he is able to claim a justifiable, reasonable, or legitimate expectation of privacy in the item seized.[19] Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). To determine if a defendant has a reasonable expectation of privacy, a court must not only consider whether the person had an actual or subjective expectation of privacy, but also whether that expectation is of a type which society at large is prepared to recognize as being reasonable. State v. Ragsdale, 381 So.2d 492 (La.1980).
Whether a person has a protected privacy interest in the contents of his text messages sent or received on his cell phone and stored by a third-party, such as Sprint Nextel, is a matter of first impression in Louisiana. In considering this res nova issue, we turn to jurisprudence from other jurisdictions for guidance to this Court.
The United States Supreme Court has consistently held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties because any reasonable expectation of privacy is destroyed when the risk of disclosure is assumed. Smith, 442 U.S. at 743-44, 99 S.Ct. at 2582. However, the Supreme Court has also recognized a “con *64 tent exception” which draws a distinction between the content of a communication and the data log stored by a third party associated with such communication. See Smith, supra (discussing the | ^distinction between the contents of a telephone call for which a legitimate expectation of privacy exists and the listing of actual phone numbers dialed for which no privacy expectation exists). The Circuit Courts have further discussed this content exception as applicable to new technologies such as email, internet searches, and text messages. See United States v. Forrester, 512 F.3d 500, 509-12 (9th Cir.2008) (holding that a computer user has no legitimate expectation of privacy in the to/from addresses of email messages sent or the internet protocol (“IP”) addresses visited by defendant on his home computer because that information is conveyed to his service provider; however, the court made a distinction between that information and the content of those emails, stating, “the contents may deserve Fourth Amendment protection, but the address and size of the package do not.”); and United States v. Warshak, 631 F.3d 266, 288 (6th Cir.2010) (holding that a subscriber enjoys a reasonable expectation of privacy in the content of emails that are stored or sent and received through a third-party internet service provider).
Considering this established jurisprudence, we find that defendant did not have a reasonable expectation of privacy in the call detail record log associated with his phone number; we therefore find that the call detail record log associated with defendant’s phone number, identified as Exhibit 88B at trial, was properly obtained by the July 25, 2009, subpoena duces te-cum at issue.[20]
| ^However, the United States Supreme Court has yet to specifically answer the question as to whether an individual has an expectation of privacy in the content of text messages sent or received on a cell phone. In City of Ontario v. Quon, - U.S. , 130 S.Ct. 2619, 177 L.Ed.2d 216 (2010), the Supreme Court held that a government employer did not violate the Fourth Amendment when it reviewed the content of personal text messages sent by an employee on a government-issued pager when it did so for a legitimate employment-related purpose. In Quon, the City of Ontario acquired twenty alphanumeric pagers capable of sending and receiving text messages for use by the Ontario Police Department employees. The City allotted to each pager a limited number of characters sent or received per month. The City required the employee to whom the pager was assigned to personally pay for any messages sent or received in excess of the assigned characters. Quon, an *65 Ontario police officer, was issued a work pager and regularly exceeded the character allotment. After recurring overage charges for pagers exceeding the allotted monthly character limit, the City conducted an audit of employees’ pager records to determine if the character limit provided for in the City contract with the service provider was sufficient to meet the City’s needs. A review of Quon’s pager records revealed that the majority of the text messages sent from his city-issued pager were personal in nature and not related to his work. Quon complained that the City’s review of his personal text messages sent and received on the city-issued pager constituted an illegal search.
Under the facts of Quon, the City was reviewing the text messages sent and received on the city-issued pagers to determine whether its contract with the service provider was sufficient to meet the City’s needs. The City was not conducting an investigation into improper use of the pagers for personal purposes; that discovery was happenstance. Based upon those facts, the Court found the ^search to be legitimate and justified. However, in the Quon case, the Court specifically declined to consider whether Quon had a reasonable expectation of privacy in the personal text messages. Rather, the court assumed, for the purpose of deciding the ease on another narrow basis, that Quon had a reasonable expectation of privacy in the messages and that the employer’s review of the messages was reasonable and legitimate under the specific facts of that case.
The Court stated that “cell phone and text message communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-identification. That might strengthen the case for an expectation of privacy.” Id., 130 S.Ct. at 2630. The Court acknowledged that the case “touches issues of far-reaching significance[21]” and cautioned that the “judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear.” Id., 130 S.Ct. at 2628-30.
The most recent case to interpret Quon provides a discussion of the recent role of text messaging in society and states:
What individuals once communicated through phone calls and letters can now be sent in a text message. Thus, as text messaging becomes an ever-increasing substitute for the more traditional forms of communication, it follows that society expects the contents of text messages to receive the same Fourth Amendment protections afforded to letters and phone calls.
State v. Clampitt, 364 S.W.3d 605, 611 (Mo.App.W.D.1/24/2012). The court in Clampitt discussed and further interpreted Quon to suggest a finding that “outside the workplace and employer-provided technological equipment, a person has a reasonable expectation of privacy with regard to cell phone and text message communications on or via privately owned equipment.” Clampitt, 364 S.W.3d. at 609-10.
lajOther courts have addressed and resolved the issue of whether an individual has an expectation of privacy in a cell phone and the content therein, including text messages, and have found that a privacy expectation exists. See, e.g., United States v. Zavala, 541 F.3d 562, 577 (5th Cir.2008) (discussing that “cell phones contain a wealth of private information, including emails, text messages, call histo- *66 ríes, address books, and subscriber numbers” and finding that defendant “had a reasonable expectation of privacy regarding such information”); United States v. Finley, 477 F.3d 250, 259 (5th Cir.2007) (holding defendant had a reasonable expectation of privacy in the content of text messages on his cell phone); United States v. Davis, 787 F.Supp.2d 1165, 1170 (D.Or.2011) (finding that review of the content of a cell phone is a “search” requiring Fourth Amendment protection); and United States v. Quintana, 594 F.Supp.2d 1291, 1299 (M.D.Fla.2009) (finding that “a search warrant is required to search the contents of a cell phone unless an exception to the warrant requirement exists”).
However, the state argues that defendant — as neither the owner nor subscriber of the cell phone at issue — has no standing to make a Fourth Amendment objection and therefore cannot assert a reasonable expectation of privacy in the text messages.[22] The United States Fifth Circuit Court of Appeals, however, in U.S. v. Finley, 477 F.3d 250, 259 (5th Cir.2007), specifically found that the defendant had a reasonable expectation of privacy in the text messages sent on his cell phone even though the phone was a business phone issued by his uncle’s business. Although the court ultimately held the text messages admissible under an exception to the warrant requirement, the court did find that the defendant had a reasonable expectation of privacy in that phone and thus standing to assert a 12(¡Fourth Amendment objection. In its decision, the court considered the fact that the defendant was permitted by his uncle to send personal text messages and make personal calls through the business phone and further stated that, “a property interest in the item seized is only one factor in the analysis[.]” Id.
We find the fact that defendant was not the owner or subscriber of the cell phone at issue does not affect his ability to make a Fourth Amendment challenge where the evidence demonstrates that defendant had a possessory interest in the phone as the exclusive user and was clearly permitted to use the phone for his own personal use to the exclusion of others.[23]
The issue before this Court is not whether the state is permitted to obtain the content of text messages sent on a defendant’s cell phone; rather, the question in this case is the standard that the state must meet in order to obtain such information. We find that here, where defendant was the exclusive user of the cell phone and was permitted to use the phone for personal purposes, he had a reasonable expectation of privacy in the text messages sent and received on the cell phone and further find that the collection and review of the content of defendant’s text messages sent and received by that phone constituted a search which required a showing of probable cause.
Once the defendant proves that a warrantless search occurred, the burden shifts to the state to affirmatively show that the search is justified under one of the narrow exceptions to the warrant requirement. State v. Gibson, 391 So.2d 421, 425 (La.1980). Here, the state argues that *67 the inevitable discovery doctrine should apply. Courts have applied the inevitable discovery doctrine in cases where law enforcement would have inevitably secured the evidence by lawful means. State v. Lee, 05-2098, pp. 22-23 (La.1/16/08), 976 So.2d 109, 127. The Louisiana [ 27Supreme Court has emphasized that “[ijntegral to the proper application of the inevitable discovery doctrine is a finding that law enforcement would have inevitably secured the evidence by lawful means, not simply that they could have[.]” Id.
The state argues that it would have inevitably discovered the contents of defendant’s text messages after an August 1, 2009, interview with defendant’s girlfriend, Jasmine Dixon, in which she discussed the fact that she exchanged text messages with defendant in the hours following the murder and revealed the content of said messages. The state argues that the interview with Dixon would have presented probable cause to issue a search warrant to obtain the content of defendant’s text messages. However, at the time of the interview with Dixon, the investigating officers had already obtained the text messages exchanged between defendant and Dixon pursuant to the article 66 subpoena duces tecum issued for defendant’s phone number and informed her of their knowledge of said text messages pri- or to the interview. Therefore, it is speculative to assume that Dixon would have disclosed to investigating officers any communication with defendant following the murder, including any text messages sent or received, had she not known that the officers had already seen the content of those messages.[24] “Application of the inevitable discovery doctrine thus ‘involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment ...’” Id. citing Nix v. Williams, 467 U.S. 431, 447, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). Because we cannot determine without speculation whether Dixon would have disclosed during the interview the existence or content of the text messages exchanged with the defendant following the murder, we decline to apply the inevitable discovery doctrine in this case. Accordingly, we 12sfind the trial court erred in denying defendant’s motion to suppress because investigating authorities’ actions in obtaining the printout of text messages associated with defendant’s phone number constituted a search and the state has failed to demonstrate the applicability of any exception to the warrant requirement.[25]
However, an erroneous denial of a motion to suppress is subject to a harmless error analysis. State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108. An error is harmless if it is unimportant in *68 relation to the whole and the verdict rendered was surely unattributable to the error. Id., 05-0011 (La.7/10/06), 936 So.2d at 140, citing State v. Koon, 96-1208, p. 9 (La.5/20/97), 704 So.2d 756, 763, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997). Factors for the court’s consideration include the importance of the evidence to the state’s case, the presence or absence of additional corroboration, and the overall strength of the state’s case. State v. Swain, 04-1001 (La.App. 5 Cir. 3/1/05), 900 So.2d 82, 89, writ denied sub nom., State ex rel. Swain v. State, 05-1333 (La.1/9/06), 918 So.2d 1040; and State v. Wille, 559 So.2d 1321, 1332 (La.1990).
Upon review of the record and the totality of constitutionally admitted testimony and evidence, we find the trial court’s error in admitting the text messages associated with defendant’s phone number to be harmless. We find the information obtained by said text messages was simply corroborative of other competent evidence introduced at trial. The evidence at trial established that there was an altercation on the evening of July 25, 2009, at Cesar’s nightclub between |29the Calliope and Gert Town gangs. Kyron’s testimony established that defendant was the driver of the vehicle from which Shawn exited and fired multiple shots in the victim’s direction. Responding officers testified that defendant vehicle’s license plate and description was obtained at the scene and a high-speed chase followed during which defendant refused to stop. The evidence established that defendant’s vehicle was subsequently discovered burned in New Orleans within a mile of defendant’s residence. In his testimony, defendant admitted that he was at Cesar’s nightclub on July 25, 2009, and that he drove the Infiniti vehicle at issue and participated in a high speed chase with officers responding to the shooting. Defendant further admitted that he went to a hotel and did not return home following the shooting. The printouts of text messages exchanged between defendant and Shykeva Bone, Erica Bone, Wilkena McCalebb and Jasmine Dixon, properly considered as evidence by this Court, further establish defendant’s participation in the murder and his actions in evading authorities thereafter. A search warrant verified defendant’s affiliation with the Gert Town gang and with co-defendant, Shawn Flot; defendant also testified that he had been shot twice in 2009 by suspected Calliope gang members.
Because we find the printout of the text messages associated with defendant’s phone number is simply corroborative of other evidence properly admitted at trial, we find the trial court’s error in denying defendant’s motion to suppress said text messages to be harmless under the facts of this case. Accordingly, for the reasons discussed herein, we affirm defendant’s conviction of the second degree murder of Demetrius Jackson.

ERRORS PATENT REVIEW

Defendant, in a pro se brief to this Court, requests an errors patent review. This Court routinely reviews the record before us for errors patent in accordance Isnwith La. C. Cr. P. art. 920 and State v. Oliveaux, 312 So.2d 337 (La.1975), regardless of whether defendant makes such a request.
In brief to this Court, defendant requests that we review his indictment for errors, contending that his indictment on its face is insufficient as it fails to cite any of the essential elements of second degree murder under La. R.S. 14:30.1, and he requests reversal of his conviction on this ground.
The true bill returned on November 19, 2009, provided that “one Eric J. Bone and Shawn A. Flot, Jr., late of the Parish of *69 Jefferson, on or about the 25th day of July in the year of our Lord, Two Thousand and Nine with force and arms in the Parish of aforesaid, and within the jurisdiction of the Twenty-Fourth Judicial District Court of Louisiana, in and for the Parish aforesaid, violated R.S. 14:30.1 in that they did commit second degree murder of Demetrius Jackson.” A review of the form of defendant’s indictment demonstrates that it meets the requirements set forth under La.C.Cr.P. art. 465. Moreover, in State v. Gainey, 376 So.2d 1240, 1244 (La.1979), the Louisiana Supreme Court stated, “the indictment itself need not set out the detailed facts constituting the violation, since those facts can be given to the defendant by answers to a bill of particulars. If the indictment sufficiently identifies the conduct charged and the statute violated, a motion to quash will not be sustained.” Here, it appears that defendant was made aware of the charges against him from the indictment and the responses filed by the state to defendant’s Motion for Bill of Particulars and Discovery and Inspection. Accordingly, our review of the record reveals no errors patent.

AFFIRMED

. Co-defendant, Shawn Flot, was also charged with second degree murder in the same indictment.

. As discussed in detail below, the testimony of Jasmine Dixon is not considered in our sufficiency analysis. However, as also discussed below, the printout of Dixon’s text messages obtained by an uncontested search warrant is considered in our sufficiency analysis.

. The record reflects that a search warrant was issued for the printout of text messages related to the phone numbers associated with Shykeva Bone, Sandra Bone, Lois Bone, Erica Bone, Lucelia McCalebb, and Jasmine Dixon. The constitutionality of that warrant is not before this Court.

. The victim, Demetrius Jackson, was also known as "Little D.”

. A distinction is made between the projectile, which is the part of a bullet that is fired from a weapon in the direction that the weapon is pointed and the cartridge casing, which is the part of a bullet that encases the projectile and is released or dropped from the weapon upon firing.

. Defendant also testified about a letter that he wrote to Shawn Flot's attorney recalling the events of the night of the shooting. In that letter, he stated that he and Shawn decided to leave the club when an unrelated physical altercation occurred. Defendant testified that he wrote that letter to Shawn Flot’s attorney because the attorney was worried that he would "turn on” his co-defendant.

. To further support his claim that a "shoot out” occurred, defendant referenced photographs of the Infiniti taken after the vehicle was found burned and argued that the photographs reflected a small hole in the vehicle’s door consistent with a bullet hole. No expert testimony was presented, however, to identify the alleged hole in the burned vehicle to be from a bullet.

. As discussed in detail in the following assignment of error, Exhibit 88C, which contains the printout of text messages sent and received on the phone associated with defendant, will not be considered in our sufficiency analysis. However, the call detail record log of incoming and outgoing calls associated with defendant’s phone number, identified as Exhibit 88B, led detectives to individuals with whom defendant apparently communicated in the hours following the murder. As also discussed in the following assignment of error, Exhibit 91, which contains the printouts of text messages associated with the phone numbers of those individuals, Shykeva Bone, Lois Bone, Erica Bone, Wilkena McCalebb and Jasmine Dixon, were obtained by warrant and introduced into evidence without objection. Thus, the printouts of those individuals' text messages obtained pursuant to the search warrant will be considered in our sufficiency analysis. The admissibility of those documents was not objected to at trial and has not been assigned as error to this Court.

. In our sufficiency analysis, we consider evidence constitutionally admitted. As discussed in detail below, we do not considered the text messages sent or received by defendant's cell phone obtained by authorities through a subpoena duces tecum without a probable cause showing. Additionally, as discussed in detail below, we do not consider the transcript of Jasmine Dixon’s statement to authorities following the murder as we find that statement to be fruit of the poisonous tree; further, because in her trial testimony Dixon discusses her statement, out of an abundance of caution, we have not considered the testimony of Jasmine Dixon in our sufficiency analysis. We do, however, consider the printout of text messages sent and received by Jasmine Dixon and other individuals, Shykeva Bone, Erica Bone, and Wilkena McCalebb, which were obtained by an uncontested search warrant.

. The testimony and evidence demonstrates that defendant had exclusive use of the cell phone at issue.

. The state points out that in a few of the text messages defendant states that he is unable to talk on his phone because he knows the police have his phone number. However, in analyzing the admissibility of the text messages, we decline to consider the content of the messages as part of our analysis.

.The trial court initially conducted a hearing on June 17, 2010, after which the court incorrectly found that the cell phone records were properly obtained pursuant to á search warrant; as such, a second hearing on defendant's motion was conducted on August 12, 2010.

. These individuals are Shykeva Bone, Sandra Bone, Lois Bone, Erica Bone, Wilkena McCalebb, and Jasmine Dixon.

. The constitutionality of that search warrant has not been raised by any party on appeal and is not before this Court.

. Defendant filed a supervisory writ with this Court, which was denied on the showing made.

. La. C. Cr. P. art. 66(A) provides:
A. Upon written motion of the attorney general or district attorney setting forth reasonable grounds therefor, the court may order the clerk to issue subpoenas directed to the persons named in the motion, ordering them to appear at a time and place designated in the order for questioning by the attorney general or district attorney respectively, concerning any offense under investigation by him. The court may also order the issuance of a subpoena duces tecum. Service of a subpoena or subpoena duces tecum issued pursuant to this Article upon motion of the attorney general may be made by any commissioned investigator from the attorney general's office, or in conformity with Article 734 of this Code.

. See 18 U.S.C.A. § 2510-2712.

. See Orin S. Kerr, A User’s Guide to the Stored Communication Act, and a Legislator’s Guide to Amending It, 72 Geo. Wash. L.Rev. 1208, 1241.

. Under federal law, a person has no standing to challenge an illegal search and seizure of a third party's properly; conversely, in Louisiana, any person adversely affected by an illegal search or seizure shall have standing to raise its illegality. State v. Jackson, 09-1983, p. 4 (La.7/6/10), 42 So.3d 368, 371-72.

. The call detail record log associated with defendant’s phone number reflects incoming and outgoing phone calls made on July 25, 2009, and demonstrates that defendant communicated with several individuals in the hours following the murder. Specifically, the call log reflects that defendant communicated with Shykeva Bone, Erica Bone, Lois Bone, Lucelia McCalebb, and Jasmine Dixon on the date of the murder, July 25, 2009. After receipt of this information, detectives issued a subpoena duces tecum for the phone records of these individuals. Sprint Nextel produced the call detail record logs for the phone numbers associated with these individuals but did not produce the text messages associated with those numbers. Thereafter, a search warrant was issued for the text messages of these individuals to discover the content of their communications with defendant following the murder. Neither party has questioned the constitutionality of the subpoena duces tecum or subsequent search warrant associated with these individuals' phone numbers. Accordingly, the constitutionality of that warrant is not before this Court and the content of those text messages, obtained by warrant and introduced at trial without objection, may properly be considered as evidence by this Court.

. Id., 130 S.Ct. at 2623.

. Defendant cites Jones, supra, to support his position that he has standing to assert an expectation of privacy as the "exclusive user" of the cell phone at issue. However, the court in Jones specifically declined to address the lower court's finding that defendant's status as the "exclusive user” of a vehicle did not affect his ability to make a Fourth Amendment objection, stating, "[w]e therefore do not consider the Fourth Amendment significance of Jones' status.”

. See Finley, 477 F.3d at 258-259.

. Detectives had not yet issued a search warrant for or received the content of Dixon’s text messages when they interviewed her on August 1, 2009.

. Although not raised by either party at the trial court level or on appeal, we note that Jasmine Dixon’s transcribed statement should have also been excluded as a "fruit” derived from the illegal search of defendant’s text messages. The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of illegality, or “fruit of the poisonous tree.” See State v. Rogers, 09-13 (La.App. 5 Cir. 6/23/09), 19 So.3d 487, 494, writ denied, 09-1688 (La.4/9/10), 31 So.3d. 382, citing State v. Nicholas, 06-903, p. 6 (La.App. 5 Cir. 4/24/07), 958 So.2d 682, 686-87. Accordingly, we did not consider the content of Dixon's August 1, 2009, statement in our sufficiency analysis. Further, because Dixon in her trial testimony discusses her August 1, 2009, interview, out of an abundance of caution, we also did not consider Dixon’s trial testimony in our sufficiency analysis.