WICKER, J.
Defendant, Trevor Clifton, appeals his convictions for sexual battery of a juvenile in violation of La. R.S. 14:43.1 and his subsequent adjudication and sentence as a multiple offender. For the following reasons, we affirm defendant's convictions but vacate his enhanced sentence as a multiple offender under La. R.S. 15:529.1, and remand this matter to the trial court for resentencing.
STATEMENT OF THE CASE
On February 4, 2016, the Jefferson Parish District Attorney filed a bill of information charging defendant, Trevor Clifton, with one count of sexual battery of a juvenile under the age of thirteen, in violation of La. R.S. 14:43.1 (count one), and one count of sexual battery of a juvenile under the age of fifteen, in violation of La. R.S. 14:43.1 (count two). Defendant pled not guilty at his arraignment.
The matter proceeded to trial and, on January 26, 2017, a twelve-person jury found defendant guilty as charged. On February 9, 2017, the trial court sentenced defendant to sixty years imprisonment at hard labor, with the first twenty-five years of the sentence to be served without benefit of parole, probation, or suspension of sentence on count one and ten years imprisonment at hard labor to be served without benefit of parole, probation, or suspension of sentence on count two. The trial court ordered defendant's sentences to be served concurrently, recommended defendant for participation in any self-help programs available to him, and ordered that, upon completion of his term of imprisonment, defendant be monitored by the Department of Public Safety and Corrections through the use of electronic monitoring equipment for the remainder of his natural life. The trial court further ordered that defendant register as a sex offender pursuant to La. R.S. 15:543.1 and provided defendant with a written copy of the sex offender notification requirements. On *695 February 23, 2017, defendant filed a motion to reconsider sentence.
The State filed a multiple offender bill of information on count one, alleging defendant to be a second felony offender, to which defendant pled not guilty. On April 13, 2017, the trial court conducted a hearing and adjudicated defendant a second felony offender. The trial court vacated defendant's sentence on count one and resentenced him, pursuant to La. R.S. 15:529.1, to sixty years imprisonment at hard labor to be served without benefit of probation or suspension of sentence.[1] After imposition of his enhanced sentence, defendant orally "converted" his previously filed motion to reconsider sentence to argue that the imposition of his sixty-year enhanced sentence was excessive. The trial court denied defendant's motion to reconsider. This timely appeal follows.
FACTUAL BACKGROUND
The victim, C.C.,[2] testified that in the early morning hours of October 2, 2015, she was in her bedroom getting ready for school. Upon exiting her room, C.C.'s "step-father,"[3] defendant, was standing in the hallway waiting for her. C.C. recalled that defendant instructed her to come over to him and to pull down her pants. He then ordered her to get down on the ground on all fours at which time he got down on his knees, pulled down his pants, and put his penis inside her vagina. C.C. testified that her mother, D.C., came out of her bedroom, saw defendant with her, and began hitting him. C.C. recalled that defendant promised her mother that he would go to church with her if she agreed not to call the police and that he then attempted to hide the phone before grabbing a knife and fleeing the house.
C.C. testified at trial that her encounter with defendant on October 2, 2015, was not the first instance of sexual abuse committed by defendant. She recalled other occasions, when her mother was not at home, in which defendant would retrieve her from her bedroom and instruct her to go out into the hallway, pull down her pants, and "get on all fours" on the floor. She testified that he would then pull down his pants and put his penis in her "booty between [her] legs." She further testified that at night, while her mother was asleep, she would lock her bedroom door and barricade it with toys but that defendant would find a way in and would tell her to do "the same thing" in the hallway. She recalled that when he would "finish" he would "clean up" with a white towel.[4]
C.C. also told the jury that there were instances "a long time ago" when defendant would pick her up from Bible study and take her to an isolated location where *696 he would instruct her to pull down her pants at which time he would get in front of her and "lay" his penis "in front of-in between [her] legs and he would, like, do it."[5] C.C. recalled an earlier incident when she and defendant were at home and he touched her legs, which she stated made her feel "scared, nervous, and disgusting." There were also times, according to C.C., when defendant would instruct her to perform oral sex on him and request that she "make noises." C.C. stated that although she would not make the "noises" requested of her, defendant would moan during the sexual acts. C.C. testified defendant instructed her not to tell her mother and that she was "scared and nervous" to tell her mother or anyone else.
Anne Troy, an expert family nurse practitioner with Children's Hospital specializing in forensic nursing, including child sexual abuse and delayed disclosure, testified at trial. Nurse Troy explained for the jury that delayed disclosures in sexual abuse cases involving children are very common due to the often close relationship between the victim and the perpetrator. She further explained it was common in sexual abuse cases for children to present with "normal bodies" upon examination. Nurse Troy testified that a sexual abuse victim may disclose information gradually as the child begins to feel more supported and that the details of the victim's reports can vary depending on who the victim is speaking to and the victim's level of comfort. Nurse Troy further explained that it is not unusual for a child to acquiesce to the sexual abuse because of his or her love for the abuser and/or shock or fear at the time of the abuse.
Nurse Troy testified that she conducted a forensic examination on C.C., who was fourteen years old at the time of the examination on October 2, 2015. C.C.'s explanation of the events to Nurse Troy corroborated C.C.'s trial testimony. During her evaluation, C.C. told Nurse Troy that her "stepdaddy" put his "private part in me." She explained she was getting ready for school on October 2, 2015, when defendant knocked on her bedroom door. C.C. told him "no leave me alone," but defendant waited in the hallway and proceeded to warn her that if she did not come with him he was going to hurt her. C.C. followed defendant's command, pulled down her pants, and got down on her knees. She told Nurse Troy that defendant then pulled down his pants and put "his private part" in her "private part." C.C. further told Nurse Troy that D.C. walked into the bathroom, saw what was going on, and began crying and hitting defendant. She recalled that D.C. told defendant she was going to call the police, and that defendant told D.C. he was not going to "do it again" and would start going to church.
During the interview with Nurse Troy, C.C. initially denied any prior sexual abuse, stating that she did not want to "get in trouble" with her mom. After Nurse Troy assured C.C. that she would not be in trouble, C.C. then relayed other occasions of sexual abuse to Nurse Troy. C.C. told Nurse Troy that, on other occasions, defendant would come into her bedroom while she was sleeping, wake her up, and tell her "you better come or I'm going to hurt you." Defendant would then instruct her to go into the hallway where he would "put his private part inside" of her.[6]
*697 C.C. recalled that her stomach hurt when he did "those things" to her and that she also feared that she would become pregnant.[7]
C.C. told Nurse Troy that the first time defendant did "something" to her was when she was "nine or thirteen." She explained she was too scared to tell her mother because defendant threatened to hurt her if she did and that often times he was drunk when he came into her bedroom. She stated that when her mother would leave the house, she would ask if she could go to her grandmother's house so that she did not have to be at home alone with defendant.
During Nurse Troy's examination, a rape kit was collected with no abnormal findings present. Testing for various sexually transmitted diseases was also performed which resulted in negative findings.[8] Nurse Troy testified that normal physical examinations are common in sex abuse cases. Nurse Troy concluded that, in her expert opinion, C.C. was subjected to sexual abuse and that there were no indications of fabrication or coaching with respect to the reported abuse.
Brittney Bergeron, a forensic interviewer for the Children's Advocacy Center ("CAC") in Jefferson Parish, testified that she conducted a forensic interview with C.C. on October 5, 2015. Concerning the October 2, 2015 abuse, C.C. further recalled-as she testified to at trial-that, after her mother discovered her and defendant having sex, defendant grabbed a knife and threatened to kill himself if D.C. contacted police.
C.C. reported other instances of abuse to Mrs. Bergeron. C.C. told Mrs. Bergeron that defendant would pick her up from Bible study and take her "somewhere else" with her responding to defendant that she did not "want to do that." C.C. further stated that on one occasion defendant told her to rub his "private part" and when she said no, he grabbed her hand and "made" her "do it" by placing her hand on his "private part." C.C. recalled on another occasion, when she was thirteen, where defendant came into her room and told her to lie down at which time he "put his private part" inside her "in front." C.C. stated that, in an effort to prevent defendant from entering her bedroom during the night, she would take her sister's toys and put them in front of her bedroom door.
C.C.'s mother, D.C., testified that she adopted C.C. shortly after she was born on November 25, 2000, and that defendant-her ex-boyfriend and father to her youngest biological child-was born on March 20, 1979. She testified that defendant began living with her in 2005 and that they moved into a new house together in Gretna in 2008, when C.C. was eight years old. D.C. testified that she ended her relationship with defendant in April of 2015 when she discovered that she had contracted a sexually transmitted disease which she believed she had contracted from defendant. However, she permitted defendant to continue living with her until he could make other living arrangements but mandated that he sleep on the couch.
D.C. recalled that on October 2, 2015, she woke up at 6:21 a.m. to discover a quiet house, which she found to be strange since her daughter was supposed to be up and getting ready for school. When D.C.
*698 walked down the hallway in search of C.C., she found C.C. and defendant "doing things." D.C. testified that when defendant saw her, he jumped up and turned away to "fix" himself. D.C. asked C.C. why she did not tell her "what was going on" with defendant to which C.C. replied, "Mama, I was scared." D.C. testified that she and defendant began fighting and that she instructed C.C. to call the police. While C.C. called the police, defendant knocked the phone from C.C.'s hand. Defendant begged D.C. not to report him to the police because "he can't go to jail" and told her, as he ran to the kitchen to retrieve a knife, that he would rather kill himself than go to jail.[9] D.C. testified that, as police arrived, defendant fled out the back door.
D.C. also recalled that she noticed changes in her daughter at the age of nine or ten years, at which time C.C.'s grades in school began to decline and she would forget certain things she had learned at a young age, such as how to tie her shoes. Upon noticing these changes, D.C. sought help for her daughter with her pediatrician who referred C.C. for psychological evaluation. In 2011, when C.C. was eleven years old, she was seen at the Jefferson Parish Human Services Authority and was diagnosed with signs of depression, depressed mood, diminished interest in pleasure, insomnia, fatigue, loss of energy, and diminished ability to concentrate.[10]
D.C. further testified that, around that same time, she noticed defendant began acting "mean" towards C.C. and observed that C.C. avoided being around defendant by locking herself in her bedroom and barricading her door at night. D.C. testified that she eventually sat down with both C.C. and defendant to figure out a solution to the obvious hostility they displayed towards one another. D.C. testified that, at that time, she attributed the hostility in C.C.'s and defendant's relationship to the recent birth of C.C.'s younger sibling-D.C.'s and defendant's biological child.
D.C. told the jury that her daughter struggles with making friends and does not care to leave the house. She further testified that C.C., even though sixteen years old at the time of trial, follows D.C. around everywhere and at times urinates on herself.[11]
Detective Joseph Hebert and Deputy Maya Seymour of the Jefferson Parish Sheriff's Office testified that on October 2, 2015, they responded to a "disturbance" call from the victim's home in Westwego. Deputy Seymour spoke to fourteen-year-old C.C., who was crying as she explained the details of what had just occurred with defendant. Detective Hebert observed that the back door of the residence was open, and defendant could not be located. Based on her discussion with C.C., Deputy Seymour placed an aggravated rape dispatch call, to which supervising officers responded, *699 and a warrant for defendant's arrest was obtained.
Upon discovering that defendant had fled the scene, Detective Donald Zanotelli with the Jefferson Parish Sherriff's Office-pursuant to an exigent circumstances request which described defendant as an aggravated rape suspect who was "suicidal, homicidal and was armed with a knife"-tracked defendant's cellular phone. A tracking of defendant's cellular devices reflected that defendant frequently contacted a cell phone registered to Trenelle Jourdan.[12] Officers arrived at Ms. Jourdan's location, where defendant was found hiding behind a refrigerator and eventually apprehended.
Ms. Jourdan confirmed that defendant called her immediately after the October 2, 2015 incident and that she picked him up near the scene of the crime. She testified that defendant appeared suicidal and told her of his intent to take his own life and "slit his wrist" with a knife. Defendant told Ms. Jourdan that he was "in trouble" and that he "did something, he drank too much."[13]
Dr. Marcella Zozaya, an expert in the field of forensic DNA analysis and comparison, testified that she analyzed the specimens in the rape kit performed on C.C. at Children's Hospital and found them to be negative for seminal fluid and spermatozoa, but noted the presence of epithelial (skin) cells on certain swabs taken during C.C.'s examination. Dr. Zozaya testified that the perineal swab and vaginal swab did not contain a detectable level of Y chromosome (male) DNA. However, with respect to the labia majora swab and the external genitalia swab, Dr. Zozaya found a detectable level of Y chromosome (male) DNA. Dr. Zozaya explained that while there was Y chromosome (male) skin cell DNA detected on the labia majora and external genitalia swabs, there was insufficient Y chromosome DNA to process a valid profile for identification comparison. Dr. Zozaya opined that it was "highly likely" that skin friction caused the shedding of the male epithelial (skin) cells that were found on C.C.'s labia majora and external genitalia.
DISCUSSION
On appeal, defendant's appointed appellate counsel has filed a brief, challenging the excessiveness of defendant's sixty-year enhanced sentence as a multiple offender pursuant to La. R.S. 15:529.1. Defendant has also filed a pro se appellate brief, raising three separate assignments of error. Because we must vacate defendant's sixty-year enhanced sentence under La. R.S. 15:529.1 due to an error patent, as discussed below, we pretermit discussion of counsel's assigned error and address defendant's pro se assignments of error in turn.
*700 Pro Se Assignment of Error No. 1
In his first pro se assignment of error, defendant contends his sexual battery upon a juvenile convictions are illegal because he was never arrested for, arraigned, or pled to the charged offenses. Defendant contends that he was arrested on charges of first degree rape and molestation of a juvenile-offenses for which he was never charged-but was subsequently convicted of sexual battery upon a juvenile in violation of La. R.S. 14:43.1, which he asserts is in violation of his due process rights.
Defendant accurately asserts that he was arrested, pursuant to an arrest warrant, on charges of first degree rape, in violation of La. R.S. 14:42, and molestation of a juvenile, in violation of La. R.S. 14:81.2, on or about October 2, 2015.[14] After his arrest, on November 6, 2015, a Jefferson Parish Commissioner found probable cause to hold defendant on charges of first degree rape and molestation of a juvenile.
On February 4, 2016, the Jefferson Parish District Attorney filed a bill of information charging defendant with one count of sexual battery of a juvenile under the age of thirteen, in violation of La. R.S. 14:43.1, and one count of sexual battery of a juvenile under the age of fifteen, in violation of La. R.S. 14:43.1. Defendant was present for his arraignment and pled not guilty at his arraignment to those charges on February 5, 2016.
While it is accurate that the district attorney charged defendant with crimes different than those for which he was arrested, the language of La. C.Cr.P. art. 61[15] gives the district attorney broad discretion in determining whom, when, and how to prosecute. Additionally, under La. R.S. 14:4[16] , when the offender's alleged conduct violates more than one criminal statute, the prosecution may proceed under any applicable statute at the discretion of the district attorney. State v. Smith , 99-0606 c/w 99-2015 (La. 7/6/00), 766 So.2d 501, 514. Thus, the district attorney in the instant case had the discretion to prosecute defendant for two counts of La. R.S. 14:43.1, where defendant's conduct was criminal under either La. 14:43.1 or the criminal statutes under which he was arrested- La. R.S. 14:42 and 14:81.2.21.[17] "It is thereafter left to the *701 trier of fact to determine if the State met its burden of proving the elements of the charged offense." State v. Fisher , 12-412 (La. App. 5 Cir. 11/27/12), 105 So.3d 964, 969. Accordingly, we find that the district attorney was within his discretion in prosecuting defendant under La. R.S. 14:43.1.[18] This assignment has no merit.
Pro Se Assignment of Error Number 2
In his second pro se assignment of error, defendant claims that the trial court erred in denying his "Motion to Enjoin Victim's Family From Showing Emotion in the Courtroom While Sitting as Spectators," which the trial judge denied on September 19, 2016. Defendant maintains that any emotion shown by the victim's family during trial could have influenced the jury verdict and denied him his right to a fair trial.
The record reflects that, in denying defendant's motion, the trial court notified the parties as follows:
The Court is going to deny said Motion, but for the record, I will let Counsel know and client know that it's normal for me to actually inform anyone who's a part of the family on either side that if they cannot control their emotions to please step outside. But I can't say what a person is going to Do, [sic] but I will instruct them that if they can't conduct themselves accordingly, to please step outside during the trial or when it gets to the point where we're talking about reading the verdict for them, so they will not be disruptive in any way.
Therefore, although the trial judge denied defendant's motion, he did warn counsel that all family members should refrain from emotion and that, if the need arose, he would remove any family member who could not control his/her emotions in the courtroom. Nevertheless, there is no indication in the record that any such admonishment or removal of any family members was necessary during the trial. Therefore, because the actions that were the subject of defendant's motion did not come to fruition, we find that defendant has failed to show that he was prejudiced or denied his right to a fair trial by the denial of this motion. This assignment has no merit.
Pro Se Assignment of Error Number Three
In his third pro se assignment of error, defendant claims generally that his constitutional right to a fair trial was denied when the trial court allowed witnesses Nurse Troy and Nancy Weber to testify as to "evidence of hearsay to verify the complaint." Defendant does not point to any specific statements made by Nurse Troy or Nancy Weber at trial that he alleges constitute hearsay. Rather, he makes a general allegation that the trial court erred in allowing the hearsay testimony of Nurse Troy and Nancy Weber. Upon review of defendant's pro se brief, we find that defendant has failed to state with specificity which statements he alleges are hearsay that the trial court impermissibly allowed at trial. Accordingly, defendant has failed to adequately brief the alleged error and the lack of specificity precludes appellate review of this assignment of *702 error.[19] See State v. Crosby , 98-0372 (La. App. 4 Cir. 11/17/99), 748 So.2d 502, 509, writ denied , 99-3463 (La. 1/28/00), 753 So.2d 833 ; see also Uniform Rules of Court-Courts of Appeal, Rule 2-12.4.
In his third pro se assignment of error, defendant further appears to challenge the sufficiency of the evidence presented against him. Defendant first contends that the evidence presented against him was insufficient because "the only evidence was the testimony of the victim and her adopted mother." Second, defendant argues that the fact that C.C. did not test positive for any sexually transmitted diseases creates reasonable doubt that defendant committed the crime, pointing to D.C.'s testimony during which she stated that she believed she contracted a sexually transmitted disease from defendant.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. State v. Bone , 12-34 (La. App. 5 Cir. 9/11/12), 107 So.3d 49, 58, writ denied , 12-2229 (La. 4/1/13), 110 So.3d 574 (citing Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. King , 06-554 (La. App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied , 07-0371 (La. 5/4/07), 956 So.2d 600 ). This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. State v. Caffrey , 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, writ denied , 09-1305 (La. 2/5/10), 27 So.3d 297.
An appellate court's primary function is not to redetermine the defendant's guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, our function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the jury's conclusion. Bone, supra ; State v. Banford , 94-883 (La. App. 5 Cir. 3/15/95), 653 So.2d 671.
*703 Evidence may be direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams , 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Bone, supra ; State v. Wooten , 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied , 99-2057 (La. 1/14/00), 753 So.2d 208.
Defendant was convicted of two counts of sexual battery of a juvenile (one count having occurred when the victim was under the age of thirteen years, and one count when the victim was under fifteen years of age). Sexual battery is defined in pertinent part as "the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, [directly or through clothing], or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, [directly or through clothing]," when the victim has not yet attained fifteen years of age and is at least three years younger than the offender.[20] Further, La. R.S. 14:43.1(C)(2) provides for a harsher penalty when the victim is under the age of thirteen and the offender is seventeen years of age or older.
The credibility of a witness, including the victim, is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Gonzalez , 15-26 (La. App. 5 Cir. 8/25/15), 173 So.3d 1227, 1233, writ denied , 15-1771, 2016 La. LEXIS 1955 (La. 9/23/16). In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Hernandez , 14-863 (La. App. 5 Cir. 9/23/15), 177 So.3d 342, 351, writ denied , 15-2111 (La. 12/5/16), 210 So.3d 810. In sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. Id.
Upon review of the record, we find that the evidence presented at trial established each element of the two offenses of sexual battery for which defendant was convicted. At trial, C.C. testified as to acts committed by defendant that constitute sexual battery occurring at various times beginning when C.C. was nine years old and concluding at the age of fourteen. She testified regarding several instances when defendant had sexual intercourse with her, when she performed oral sex on defendant at his instruction, and when defendant forced her to touch his penis with her hand, all of which constitute sexual battery. See State v. Perkins , 11-162 (La. App. 5 Cir. 12/28/11), 83 So.3d 250, 257 ; State v. Bienvenu , 14-541 (La. App. 5 Cir. 12/16/14), 167 So.3d 63, writ denied , 15-0098 (La. 11/20/15), 180 So.3d 314 ; and *704 State v. Anderson , 10-779 (La. App. 5 Cir. 3/27/12), 91 So.3d 1080.
The eyewitness testimony of D.C.-who testified that she walked in on defendant and her daughter having sexual contact on October 2, 2015-corroborated C.C.'s trial testimony. Further, the recorded interviews with Nurse Troy and Mrs. Bergeron corroborated C.C.'s testimony concerning both the October 2, 2015 incident as well as earlier incidents of abuse. Additionally, the State produced evidence to show that, on the date of the alleged October 2, 2015 sexual abuse, the DNA swabbing of C.C.'s vaginal area reflected male DNA skin cells on the outside and inside of her vagina. We find the evidence presented at trial against defendant to be sufficient to support his convictions for sexual battery in violation of La. R.S. 14:43.1.
Moreover, defendant's hypothesis of innocence that C.C. would have necessarily tested positive for an STD if she had sexual contact with defendant is not supported in the record. First, other than D.C.'s speculative testimony that she "believed" she contracted an STD from defendant, no evidence was presented to establish that defendant in fact had an STD or that he transmitted an STD to D.C. Further, Nurse Troy testified that C.C. was tested for various STDs, but was not tested for all STDs and was never tested for Trichomonas Vaginalis, the only specific STD referenced at trial.[21] Moreover, defendant's hypothesis of innocence was presented by the defense in closing arguments and rationally rejected by the jury. This assignment lacks merit.
ERRORS PATENT
We have reviewed the record for errors patent in accordance with La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5 Cir. 1990). The record reflects the following errors patent.
First, defendant received an illegally lenient multiple offender sentence on count one. The transcript reflects that when the trial judge resentenced defendant on count one-sexual battery of a juvenile under the age of thirteen-he imposed a sixty-year sentence without the benefit of probation or suspension of sentence. The multiple offender statute, La. R.S. 15:529.1(G), provides that any sentence imposed under its provisions "shall be at hard labor without benefit of probation or suspension of sentence." Thus, the multiple offender statute does not impose a parole restriction. Nevertheless, the restrictions on parole eligibility imposed on habitual offender sentences under La. R.S. 15:529.1"are those called for in the reference statute." State v. Esteen , 01-879 (La. App. 5 Cir. 5/15/02), 821 So.2d 60, 79 n.24, writ denied , 02-1540 (La. 12/13/02), 831 So.2d 983. In this case, the underlying offense in the reference statute, La. R.S. 14:43.1, imposes a parole restriction. La. R.S. 14:43.1(C)(2) requires that "at least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence." Therefore, we find that the trial court erred by not restricting parole eligibility on defendant's enhanced sentence for at least twenty-five years.
Because the trial judge did not mandate the length of time that defendant must *705 serve without benefit of parole, and because the language of the sentencing statute requires an exercise of the trial court's discretion in determining the exact length of time that benefits are to be restricted, we vacate defendant's enhanced sentence on count one and remand this matter for resentencing in accordance with the underlying statute. See State v. Wilt , 14-823 (La. App. 5 Cir. 4/29/15), 170 So.3d 317, 327, writ denied , 15-1055 (La. 5/2/16), 206 So.3d 877 ; State v. Smith , 09-100 (La. App. 5 Cir. 8/25/09), 20 So.3d 501, 508-09, writ denied , 09-2102 (La. 4/5/10), 31 So.3d 357.
Second, there are several discrepancies between the transcript and the original Louisiana Uniform Commitment Order (UCO). Generally, when the transcript and commitment are inconsistent, the transcript prevails. State v. Lynch , 441 So.2d 732, 734 (La. 1983). The UCO indicates that the offense date was November 25, 2009; however, the record reflects that the offenses occurred on multiple dates: count one-on or between November 25, 2009 and November 24, 2013; and count two-on or between November 25, 2013 and October 2, 2015. Additionally, the UCO reflects that defendant was given "60 Year(s) without benefit of parole, probation, or suspension of sentence." However, during sentencing, the trial court imposed only twenty-five years of the sixty-year sentence to be served without benefit of parole, probation, or suspension of sentence on count one. Thus, the UCO should reflect that twenty-five years, and not sixty years, of defendant's original sixty-year sentence be served without benefit of parole, probation, or suspension of sentence.
Accordingly, we remand this matter to the trial court for correction of the UCO and direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department. See State v. Long , 12-184, pp. 10-11 (La. App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142 (citing La. C.Cr.P. art. 892(B)(2) ).
In this case, the State introduced sufficient proof through competent evidence that defendant was the individual who pled guilty to possession of cocaine, in violation of La. R.S. 40:967(C), in case number 99-6591 of the 24th Judicial District Court on December 2, 1999. The State offered proof of defendant's identity through a certified conviction packet, waiver of rights form, a fingerprint card associated with the prior conviction, and the testimony of fingerprint expert witness Joel O'Lear at the multiple bill hearing. Thus, we find that the trial court's failure to advise defendant of his multiple offender rights is not a reversible error requiring corrective action.
DECREE
Accordingly, for the reasons provided herein, defendant's convictions are affirmed. Defendant's multiple offender sentence on count one is vacated and this matter is remanded for resentencing and for further corrective actions consistent with this opinion.
CONVICTIONS AFFIRMED; MULTIPLE OFFENDER SENTENCE VACATED; MATTER REMANDED

During sentencing on defendant's multiple bill, the trial court again recommended defendant for participation in any self-help programs available to him, advised him of his sex offender registration obligations previously provided to him in writing at original sentencing on February 9, 2017, and ordered that upon completion of his term of imprisonment, defendant be monitored by the Department of Public Safety and Corrections through the use of electronic monitoring equipment.

In accordance with La. R.S. 46:1844(W)(3), the victim, who is a minor, and the victim's family members will be referred to by their initials to protect the victim's identity. C.C. was sixteen years old at the time of trial and testified that she was born on November 25, 2000.

While C.C. referred to defendant as her "step-father," having known him for nearly her entire life, the testimony at trial appears to establish that defendant and C.C.'s mother-D.C.-were never married.

D.C., C.C.'s mother, confirmed in testimony that, during her intimate relationship with defendant, he would often ejaculate into a white towel.

C.C. testified that she went to Bible study "a long time ago." D.C. testified that C.C. began going to Bible study in 2009 when C.C. was approximately eight or nine years old. Also, on cross-examination, C.C. testified that she was nine years old the first time the sexual abuse began.

C.C. also told Nurse Troy that, on one occasion, defendant made her put her mouth on his "private part."

Nurse Troy confirmed that it is common for a child to have somatic complaints, such as stomach pain, to express their pain.

Nurse Troy noted that a test for Trichomonas Vaginalis was not performed on C.C., but that C.C. was nonetheless treated for it, per standard of care guidelines.

The 9-1-1 recording was played for the jury during the testimony of Jefferson Parish Sheriff's Office custodian of records, Nancy Webber. On the recording, a man is heard stating "I didn't do that" before the phone is disconnected. The 9-1-1 operator is then heard calling back and a man's voice is heard stating, "I can't go to jail" before it is again disconnected. A third attempt is made by the 9-1-1 operator to reach the person who placed the call, at which time a man states "don't answer the phone" before it is disconnected for the last time.

Nurse Troy confirmed that it is common for victims who have a history of sexual abuse to exhibit certain symptoms such as poor school performance, depression, diminished interest in pleasures or activities, insomnia, and fatigue.

Nurse Troy testified at trial that day and night time bedwetting has been correlated with sexual abuse in children.

Having been unable to locate defendant at any of the addresses associated with his cell phone, it was soon discovered from defendant's cell phone provider that defendant had disconnected his phone that day and changed his cell phone number. A trace of defendant's new cell phone number revealed that defendant had contacted Ms. Jourdan numerous times on that date. Detective Zanotelli learned that Ms. Jourdan had a Mustang model vehicle registered in her name so he placed her license plate number in the Automatic License Plate Recognition System in an attempt to determine her vehicle's location.

Detective Kay Horne of the Jefferson Parish Sheriff's Office testified that she spoke to Trameka Clifton-defendant's sister-while attempting to locate defendant. Detective Horne testified that Ms. Clifton reported to her that defendant told Ms. Clifton that, on the date of the incident in question, he was asleep in the hallway and woke up to discover C.C. performing oral sex on him, and that it was "just a big misunderstanding." At trial, Ms. Clifton denied making that statement to police.

On October 7, 2015, defendant was brought before a Jefferson Parish Commissioner on a motion to set bond. The Commissioner set his bond on the first degree rape at $750,000, and on the molestation of a juvenile at $50,000.

La. C.Cr.P. art. 61 provides:
Subject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute.

La. R.S. 14:4 provides:
Prosecution may proceed under either provision, in the discretion of the district attorney, whenever an offender's conduct is:
(1) Criminal according to a general article of this Code or Section of this Chapter of the Revised Statutes and also according to a special article of this Code or Section of this Chapter of the Revised Statutes;
or
(2) Criminal according to an article of the Code or Section of this Chapter of the Revised Statutes and also according to some other provision of the Revised Statutes, some special statute, or some constitutional provision.

In State v. Juluke , 374 So.2d 1259 (La. 1979), a case in which the defendant was charged with forgery, a felony, in violation of La. R.S. 14:72, the defendant filed a motion to quash on the basis that he should have been charged with unauthorized use of a credit card (La. R.S.14:67.3 ), a misdemeanor. The trial court granted the motion. On appeal, the Louisiana Supreme Court stated that the defendant's conduct would be criminal under either La. R.S. 14:72 or La. R.S. 14:67.3. The Court found that although the State might have chosen to prosecute the defendant under La. R.S. 14:67.3, it was within the discretion provided to the district attorney under La. R.S. 14:4 to charge her under the general forgery statute. As such, the Louisiana Supreme Court reversed the ruling of the trial court and remanded for further proceedings.

Defendant does not allege that he did not have knowledge or notice of the charges against him.

The record reflects that, prior to trial, defendant's counsel filed two motions in limine, which the trial court denied on September 19, 2016. In his motions, defendant sought an order barring the State from introducing, through the testimony of any witness, out-of-court statements that were elicited during any forensic interview. Defendant argued that any statement made by C.C. to anyone constituted inadmissible hearsay in violation of his right to confrontation. On appeal, defendant does not assign the trial court's denial of these motions as error but rather makes a conclusory allegation that Nurse Troy and Nancy Weber's testimony was based on hearsay and should have been excluded. Nevertheless, as to any alleged hearsay statements made in the audio recorded medical history of the victim as testified to by expert family nurse practitioner Anne Troy-taken at the hospital on the same day of the last incident of alleged sexual abuse and in conjunction with the victim's physical examination, which included vaginal DNA swabbing-those statements are admissible under La. C.E. art. 803(4) as a "statement for purposes of medical treatment and medical diagnosis." See State v. Koederitz , 14-1526 (La. 3/17/15), 166 So.3d 981. Moreover, disclosures made by C.C. to her mother when D.C. discovered defendant having sexual contact with C.C., and disclosures of prior abuse C.C. made to Nurse Troy during her interview, were both initial reports of different instances of sexual abuse. A statement is not hearsay if the declarant testifies at trial subject to cross-examination and the statement is consistent with the declarant's testimony and is one of an initial complaint of sexually assaultive behavior. La. C.E. art. 801(D)(1)(d) ; See State v. Burks , 04-1435 (La. App. 5 Cir. 5/31/05), 905 So.2d 394, 402, writ denied , 05-1696 (La. 2/3/06), 922 So.2d 1176. Further, as to 9-1-1 records custodian Nancy Webber, the record reflects that C.C. did not make any statements to Ms. Weber and is also not heard on the 9-1-1 recording played for the jury.

The bill of information alleged that the count of sexual battery upon a victim under the age of thirteen years occurred on or between November 25, 2009 and November 24, 2013, and that the count of sexual battery of a juvenile under fifteen years of age occurred on or between November 25, 2013 and October 2, 2015. The bracketed language, "directly or through clothing," was added to the definition of sexual battery by Acts 2015, No. 256 § 1, effective August 1, 2015. The amendment of the definition language does not affect a sufficiency of the evidence analysis in this case.

The record reflects that when the State questioned Nurse Troy whether "it is possible for a person to have intercourse with one person and infect them with an STD and have sex with another person and not transmit that STD," defense counsel objected to the line of questioning on the grounds that Nurse Troy was not an expert in the transmission of STDs. The trial court sustained the objection.