STATE OF LOUISIANA

VERSUS

CHRISTOPHER L. DAVIS

NO. 22-KA-281

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 20-44, DIVISION "I"
HONORABLE NANCY A. MILLER, JUDGE PRESIDING


March 08, 2023


**JOHN J. MOLAISON, JR.**
**JUDGE**


Panel composed of Judges Jude G. Gravois,
Stephen J. Windhorst, and John J. Molaison, Jr.


**<u>AFFIRMED</u>**
   **JJM**
   **JGG**
   **SJW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Monique D. Nolan
 Rachel L. Africk
 Lindsay L. Truhe

COUNSEL FOR DEFENDANT/APPELLANT,
CHRISTOPHER L. DAVIS
 Bertha M. Hillman

**MOLAISON, J.**

The defendant/appellant, Christopher L. Davis, appeals his conviction of second-degree murder. For the reasons that follow, we affirm his conviction and sentence.

## PROCEDURAL HISTORY

On July 30, 2020, a Jefferson Parish Grand Jury indicted the defendant with the second degree murder of Lashonda Sands in violation of La. R.S. 14:30.1 (count one) and possession of a firearm by a person convicted of domestic abuse battery in violation of La. R.S. 14:95.10 (count two). The defendant pled not guilty at arraignment on August 10, 2020.

On March 8, 2022, the defendant pled guilty to count two and was sentenced to imprisonment at hard labor for ten years without the benefit of parole, probation, or suspension of sentence. The defendant then proceeded to trial before a twelve-person jury on the second-degree murder charge, and on March 10, 2022, the defendant was found guilty as charged. Following a hearing on March 14, 2022, the defendant's motion for new trial was denied. Thereafter, the defendant waived sentencing delays, and the trial court sentenced him to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. This timely appeal followed.

## FACTS

At trial, Kelon Mansion testified that on January 5, 2020, he, Christopher Davis, and Lashonda Sands went to a party, after which they went back to the apartment where the defendant and Ms. Sands lived. The defendant's son, who was between five and eight years old, was also there. Mr. Mansion testified that they were "chilling" and playing video games. At some point, the defendant was in the kitchen and Mr. Manson was sitting on the sofa near Ms. Sands. He heard Ms. Sands say "Oh no," and she put her head down, and immediately went into a

"deep cry." He was able to see Ms. Sands' phone where he saw a message indicating that someone had just died. Mr. Mansion testified that the defendant came out of the kitchen, stood in front of them, and continually asked Ms. Sands questions such as what was wrong, how had the person died, and whether the defendant knew the person. Ms. Sands just shook her head, continued crying, and did not respond to the defendant. Mr. Mansion stated that the defendant told Ms. Sands that his son was paying attention to the situation and to "get the f up" as she was "making this look bad" in front of his son.

Mr. Mansion testified that Ms. Sands jumped up, "started going off by the mouth," and fought with the defendant, explaining that Ms. Sands was "swinging" at the defendant, who did not swing back. The defendant held her wrists, pushed her off, and went to the bedroom. Mr. Mansion testified that when the defendant came out of the bedroom, the defendant had a revolver in his right hand. He told the defendant, "Bro, there's no cause for this. Go put that up."

Mr. Mansion testified that he stood in front of the defendant to try and stop him. He explained that he placed his hand on the defendant's wrist or forearm to stop the defendant from raising or pointing the gun at Ms. Sands. Mr. Mansion testified that the defendant pushed him out of the way with his left hand causing him to "tumble" off to the side. The defendant then "went under" Mr. Mansion's arm and fired the gun. Mr. Mansion explained that Ms. Sands was walking out the front door and before the door closed, he heard a "boom" and then two "whines." He saw Ms. Sands lying on the ground. There was blood on her left ear and on the floor traveling from the back of her head. He stated that he saw her take her two last breaths.

Mr. Mansion testified that the defendant told him to call the police, but Mr. Mansion was unable to find a phone. The defendant retrieved the phone from Ms.

Sands and called the police.[1] Mr. Mansion asserted that when the police arrived, the defendant told them that once Ms. Sands left, they heard a loud bang, and that when they went to check on her, she was on the floor.

After the police arrived, Mr. Mansion and the defendant were handcuffed and placed in separate police cars. Mr. Mansion testified that he later told the police that the defendant's version of the incident was not the truth.[2]

Officer Ellied Riley, of the Jefferson Parish Sheriff's Office (JPSO), testified that he was the first officer on the scene in response to the 9-1-1 call. When he arrived at the apartment complex, two people, one of whom was Mr. Mansion, flagged him down and told him where to go. Officer Riley stated that when he got to the apartment, he saw a black female, later identified as Ms. Sands, lying on her back on the floor; the upper half of her body was lying almost outside the door and the rest of her body was inside the door. Defendant was standing over her. Officer Riley could not revive her.

Officer Riley further testified that when he asked what happened, the defendant told him that he was inside playing a game, heard a "pop," came outside, and found her like this. EMS arrived on the scene and took Ms. Sands away. Officers entered the apartment and conducted a security sweep to see if anybody was armed or injured. The scene was photographed and secured, and homicide was notified. Officer Riley informed the detectives of what the defendant and Mr. Mansion had told him.

---

[1] The 9-1-1 call was published to the jury.

[2] Mr. Mansion's statement was played for the jury. In his statement, Mr. Mansion said that he, the defendant, and the victim went to a party, after which they went back to the apartment where the defendant lived. Mr. Mansion said that at some point, the victim blurted out, "Oh no," after which he saw her phone indicating that her friend had died. He explained that the defendant tried to find out who it was but that the victim did not respond. Mr. Mansion stated that the defendant and the victim were upset and that the victim said "stuff." He stated that the victim began to walk out the door and that the defendant retrieved a small revolver. Mr. Mansion said that he told the defendant, "no," and tried to stop him. He explained that the defendant fired the gun one time. Mr. Mansion stated that he opened the door and saw the victim lying on the ground. The defendant told him to call the police but Mr. Mansion could not find a phone. The defendant called the police. When Mr. Mansion saw the police lights, he signaled to the police to come to the apartment. Mr. Mansion said that he did not know what happened to the gun.

Detective Anthony Buttone, of the Jefferson Parish Sheriff's Office, testified that on January 5, 2020, he responded to the scene of Ms. Sands' shooting. He obtained a search warrant and searched the apartment. Among items recovered was a Smith and Wesson .38 special revolver, found in a bedroom, with four projectiles inside. One of the cartridges in the cylinder had been fired.

Dana Troxclair, who was accepted as an expert in the field of forensic pathology, testified that she performed an autopsy on Ms. Sands on January 6, 2020. The main injury to Ms. Sands was a gunshot wound to the back of her head that perforated the skull and entered her brain. Ms. Sands had a few abrasions and contusions on her hands, fingers, and lower left leg. Dr. Troxclair testified that the cause of death was a gunshot wound to the head and that the death was classified as a homicide. Dr. Troxclair recovered a part of the projectile from the brain and turned it over to a Jefferson Parish crime scene technician.

Alexis Rivera, a firearms examiner with the JPSO, who was accepted by the court as an expert in firearms examination, testified that testing revealed that the projectile recovered from Ms. Sands' head was fired from the gun recovered at the scene.

Detective Donald Zanotelli, who was employed by the JPSO prior to his retirement, testified that he responded to the crime scene in the instant case. The defendant and Mr. Mansion were transported to the detective bureau, where they were advised of their rights. The defendant waived his rights and gave a videotaped statement.[3] The defendant ultimately admitted that the gun found in the bedroom at the scene belonged to him. Detective Zanotelli stated that a bullet

---

[3] The statement was played for the jury. In his statement, the defendant said that he, Mr. Mansion, and the victim went to a party, after which they went to the apartment where the defendant lived. He stated that the victim was sitting on the sofa when she received a text message that her friend had died. The defendant explained that he asked her what happened but got no response. He stated that he and the victim argued, the victim then pushed him, he walked to the "room," and the victim went out the door. The defendant stated that he heard a "pop," after which Mr. Mansion opened the door and "hollered" for him. He stated that they saw the victim lying on the ground. The defendant admitted that he had a .38 revolver but that he did not retrieve it during the incident. He said that he called the police.

fragment from the victim's head was sent to the lab and that it was concluded to be fired from that gun. Detective Zanotelli noted that the defendant's admission that he and the victim fought about a text message regarding somebody dying and that Ms. Sands tried to leave the apartment when the defendant went into the bedroom, was consistent with Mr. Mansion's statement. Detective Zanotelli testified that the gun was fired from within the apartment and that the victim was walking from inside the apartment to outside when she was shot. Detective Zanotelli noted that the defendant did not tell the 9-1-1 dispatcher, nor any officers that the shooting was an accident. After determining that the defendant intentionally fired the gun, an arrest warrant was obtained and the defendant was arrested.

Marcela Zozaya, who was accepted as an expert in the field of forensic DNA analysis, testified that she was the "technical reviewer" of a DNA report in the instant case in her capacity at the JPSO. She reviewed and agreed with the DNA report issued by Cara Kovach, who no longer worked for the JPSO. The report concluded that defendant was excluded as a contributor to the mixture of DNA on the revolver found at the scene. Sarah Serou, who was also accepted an expert in the field of forensic DNA analysis, testified that both the defendant and Mr. Manson were excluded as contributors to the mixture of DNA found on the revolver recovered from the scene. Ms. Serou testified that this did not mean that the defendant or Mr. Mansion did not touch that gun.

Aunreese Washington, who had been friends with Ms. Sands since 2009, testified that she and Ms. Sands met the defendant on the same night in 2017, and that Ms. Sands and the defendant subsequently started a relationship. Ms. Washington testified that on Thanksgiving Day in 2018, the defendant backed into her aunt's boyfriend's car, after which Ms. Sands and the defendant began "fussing" and cursing at each other. Ms. Washington recalled the defendant telling Ms. Sands, "I'll shoot your motherf*cking ass." The defendant reached into the

back of his hatchback and her cousin's boyfriend slammed the hatchback on the defendant because he did not know if a gun was in there. They eventually raised the hatchback and she told the defendant to calm down. Ms. Washington explained that Ms. Sands was still "ramping," but they walked her away and the defendant was "p*ssed off," so he started going toward Ms. Sands. The defendant eventually left, but that Ms. Sands stayed. The police were not called.

Tierra Jones, Ms. Washington's sister, had also been friends with Ms. Sands since 2009. Ms. Jones testified that there were times when she did not approve of the way the defendant treated Ms. Sands. She recalled the incident on Thanksgiving Day in 2018, when the defendant hit her aunt's boyfriend's car. Ms. Jones testified that the defendant and Ms. Sands argued, after which the defendant said he was going to get a gun from underneath the "tire part" of the hatchback of their vehicle and shoot Ms. Sands. Ms. Jones recounted another incident in 2019, in which the defendant was choking Ms. Sands to the point where her face was turning purple. Ms. Jones testified that she told the defendant to let Ms. Sands go before he choked her to death and that the defendant responded that he would kill her. She and Ms. Sands left in Ms. Jones' vehicle. Three or four days later, the defendant called Ms. Sands to come back over like nothing had happened, and Ms. Sands returned to stay with the defendant. Ms. Jones testified regarding another incident between July and September 2019 - after a group of "them" left a bar, they stopped at the defendant's house, where he retrieved a gun. Ms. Jones testified that the defendant said he would kill Ms. Sands and then shot the gun at the ground three times. The police were not called. Ms. Jones testified that after the defendant was in jail, Mr. Mansion told her that the defendant shot Ms. Sands.

The State and the defense stipulated that the defendant was the same person who was previously convicted of domestic abuse battery of Shannon Cooper in case number 16-680N, pointing out that the offense occurred on February 4, 2016.

They also stipulated that the defendant pled guilty as charged to domestic abuse battery on Ms. Cooper on March 23, 2017. In connection with this stipulation, the State introduced a certified copy of the defendant's conviction of domestic abuse battery in case number 16-680N.

## ASSIGNMENT OF ERROR NUMBER ONE

The evidence was insufficient to support a conviction of second degree murder.

## DISCUSSION

In his sole assignment of error, the defendant argues that the evidence was insufficient to support his conviction of second degree murder because the State failed to prove he was the shooter. He contends that only he and Mr. Mansion were in the room when the victim was shot and that either one of them could have fired the shot that killed her. He points out that both of the State's experts testified that his DNA was not on the gun. The defendant maintains that the only evidence the State presented to implicate him was the testimony of Mr. Mansion, whom he argues could have been the shooter. He contends that there was a major inconsistency in Mr. Mansion's testimony, namely that although officers found a gun inside the house, the defendant could not have been the person who concealed it because Mr. Mansion testified that the defendant never entered the house after the victim was shot. However, he contends that Mr. Mansion went back inside the house after the shooting.

Alternatively, the defendant argues that if this Court finds that he was the shooter, then the evidence was only sufficient to support a conviction of negligent homicide because he was criminally negligent and had no intent to kill the victim. The defendant also argues that even if this Court finds that the State proved specific intent to kill, the verdict is based on insufficient evidence because the evidence established provocation and heat of passion sufficient for manslaughter.

22-KA-281                                    7

He maintains that the victim's physical attack, verbal abuse, and hysterical crying provoked him and deprived him of self-control and cool reflection.

The State responds that the evidence was sufficient to support the defendant's conviction of second degree murder. The State argues that it presented sufficient evidence at trial to prove that the defendant killed the victim and that he had the specific intent to kill or to inflict great bodily harm. It contends that the defendant's identity as the shooter was clearly established. The State points out that the jury found the State's witnesses and other evidence credible and rejected any argument that the shooting was an accident. The State responds that the jury had every opportunity to consider the mitigating factors for manslaughter, yet chose not to convict the defendant of that offense. As such, the State argues that the defendant's conviction and sentence should be affirmed.

When reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct, circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The reviewing court is not required to determine whether a defendant's suggested hypothesis of innocence offers an exculpatory explanation of events. Rather, the reviewing court must evaluate the evidence in the light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found

proof of guilt beyond a reasonable doubt. *State v. Baham*, 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566, *writ denied*, 15-40 (La. 3/24/16), 190 So.3d 1189.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is the identification, the State is required to negate any reasonable probability of misidentification to carry its burden of proof. *State v. Ray*, 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, *writ denied sub nom. State ex rel. Ray v. State*, 13-1115 (La. 10/25/13), 124 So.3d 1096.

In the instant case, the defendant was convicted of second degree murder, which is defined in La. R.S. 14:30.1(A) as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. *State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, *writ denied*, 06-757 (La. 12/15/06), 944 So.2d 1277. The jury in this case was instructed that they could find the defendant guilty of second degree murder under La. R.S. 14:30.1(A)(1) if they found the State proved specific intent, and that they could alternatively find the defendant guilty of the responsive verdicts of manslaughter or negligent homicide.

Specific intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances and the actions of the accused. *State v. Trim*, 12-115 (La. App. 5 Cir. 10/16/12), 107 So.3d 656, 660, *writ denied*, 12-2488 (La. 4/19/13), 111 So.3d 1030. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is guided by the *Jackson*

standard. *State v. Patterson*, 10-415 (La. App. 5 Cir. 1/11/11), 63 So.3d 140, 148, *writ denied*, 11-338 (La. 6/17/11), 63 So.3d 1037.

Manslaughter is defined in La. R.S. 14:31(A)(1) as follows:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Rather, they are mitigatory factors that may reduce the grade of the offense. *State v. Lawson*, 08-123 (La. App. 5 Cir. 11/12/08), 1 So.3d 516, 523. In order to be entitled to the lesser verdict of manslaughter, a defendant is required to prove the mitigatory factors by a preponderance of the evidence. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. The question for the appellate court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *Lawson*, *supra*.

Negligent homicide is "the killing of a human being by criminal negligence." La. R.S. 14:32(A)(1). "Criminal negligence exists when although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La. R.S. 14:12. Ordinary negligence does not equate to criminal negligence; the State is required to show more than a mere deviation from

the standard of ordinary care. *State v. Becnel*, 17-591 (La. App. 5 Cir. 6/27/18), 250 So.3d 1207, 1226.

Our review of the evidence presented by the State in this case indicates that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support the defendant's conviction of second degree murder. Mr. Mansion testified that the defendant and the victim argued about a text message the victim received, after which the victim pushed the defendant and started to leave the apartment. He further testified that the defendant then went to another room and retrieved his gun. Mr. Mansion explained that he stood in front of the defendant and tried to stop him, but that the defendant pushed him aside and shot the victim as she was walking out the door. Identification by only one witness is sufficient to support a conviction. *State v. Williams*, 08-272 (La. App. 5 Cir. 12/16/08), 3 So.3d 526, 529, *writ denied*, 09-143 (La. 10/16/09), 19 So.3d 470. In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 703.

The evidence presented by the State proves that the defendant had the specific intent to kill Ms. Sands when he pointed the gun at her and fired. Detective Zanotelli testified that a firearm was recovered from a box in the defendant's son's room and that the defendant admitted that the gun belonged to him. He and Ms. Rivera, the expert firearms examiner, testified that testing revealed that the bullet fragment recovered from the victim's head was fired from the gun found at the scene. Detective Zanotelli testified that the gun was fired from within the apartment and that the victim was walking from inside the apartment to outside when she was shot. Additionally, Dr. Troxclair testified that the victim died from a gunshot wound to the back of her head that perforated the

skull into her brain. *See State v. Anderson*, 18-45 (La. App. 5 Cir. 10/17/18), 258 So.3d 997, 1002, *writ denied*, 18-1848 (La. 4/15/19), 267 So.3d 1131 (Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person, as well as the extent and severity of the victim's injuries.).

Alternatively, the defendant argues that the evidence only showed that he should have been convicted of negligent homicide or manslaughter. However, the jury clearly believed the State's witnesses and found that the evidence established that the defendant committed second degree murder, thereby rejecting the responsive verdicts of negligent homicide and manslaughter. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

Accordingly, viewing the evidence in the light most favorable to the prosecution under the *Jackson* standard, we find that a rational trier of fact could have found that the evidence was sufficient to convict the defendant of second degree murder. This assignment is without merit.

**ERRORS PATENT DISCUSSION**

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

The transcript reflects that the trial court informed the defendant that he had "two years from the day of your judgment of conviction becomes final in which to file an application for post-conviction relief." The sentencing minute entry shows that the trial court informed the defendant that he had "two (2) years after judgement of conviction and sentence has become final to seek post-conviction relief." When there is a conflict between the transcript and a minute entry, the

transcript prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983). The failure of the trial judge to advise a defendant that the prescriptive period for seeking post-conviction relief runs from the time his conviction and sentence become final renders the advisal incomplete. *State v. Moran*, 08-462 (La. App. 5 Cir. 11/12/08), 1 So.3d 545, 546.

If a trial court fails to properly advise pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *State v. Francis*, 17-651 (La. App. 5 Cir. 5/16/18), 247 So.3d 199, 205. Accordingly, by way of this opinion, the defendant is advised that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## CONCLUSION

Accordingly, for the foregoing reasons, the defendant's conviction of second degree murder and sentence are affirmed.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MARCH 8, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 22-KA-281

## E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE NANCY A. MILLER (DISTRICT JUDGE)
MONIQUE D. NOLAN (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          BERTHA M. HILLMAN (APPELLANT)

## MAILED
CHRISTOPHER DAVIS #767339
(APPELLANT)
LOUISIANA STATE PENITENTIARY
ANGOLA, LA 70712

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
LINDSAY L. TRUHE (APPELLEE)
DISTRICT ATTORNEY
RACHEL L. AFRICK (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053